PEARL SORRELL V. THE STATE.

No. 2828. Decided June 26, 1914.

**1.—Murder—Degrees of Murder—Change of Law.**

The abolishing of the degrees of murder under the recent statute does not repeal the law of murder, and where defendant had been tried under the old law and convicted of murder in the second degree, his contention that he could not be again tried for murder in the second degree, but only for manslaughter is untenable. Following Shaw v. State, 71 Texas Crim. Rep., 630, and other cases.

**2.—Same—Change of Venue—Prejudice—Fair and Impartial Trial.**

Where, upon trial of murder, the defendant filed an application for a change of venue on account of the prejudice against him in the county of the

prosecution to the extent that he could not get a fair and impartial trial, and the evidence was sufficient to sustain his application, the venue should have been granted, although the application was contested by the State and the evidence was conflicting. Prendergast, Presiding Judge, dissenting.

### 3.—Same—Evidence—Dying Declarations.

Where, upon trial of murder, a sufficient predicate was laid to admit in evidence the dying declarations of the deceased, there was no error in admitting same; however, the advice of the witness to the deceased that he should have known better than to go out there, etc., should not have been admitted; neither should the declarations of the deceased that he was shot down like John Ross have been admitted. Prendergast, Presiding Judge, dissenting.

### 4.—Same—Rule Stated.

Where evidence of this character is intentionally and deliberately introduced, the same is reversible error.

### 5.—Same—Evidence—Judgment Nisi—Flight.

Where, upon trial of murder, the defendant's flight was admissible in evidence, yet a judgment nisi declaring a forfeiture under defendant's bond was inadmissible for this purpose. Prendergast, Presiding Judge, dissenting.

### 6.—Same—Evidence—Prior Difficulty.

The merits of a prior difficulty between deceased and two of defendant's younger brothers were not material under defendant's trial for murder, yet any knowledge or information brought home to the defendant concerning this difficulty was admissible on the issue of malice and manslaughter.

### 7.—Same—Evidence—Former Conviction.

Where, upon trial of murder, the State was permitted to ask defendant if it was not a fact that he had before been convicted upon a former trial in the case now being tried, to which objection was overruled and defendant was required to testify that he had been so convicted, the same was reversible error, and this, although defendant had filed his plea for a suspension of sentence and the jury knew of his former conviction. Prendergast, Presiding Judge, dissenting.

### 8.—Same—Evidence—Acts of Defendant.

Upon trial of murder, testimony that defendant was seen near the fence of deceased armed with a gun and that he was seen going back and forward to this place different times with a gun, it not being connected up sufficiently, was inadmissible. Prendergast, Presiding Judge, dissenting.

### 9.—Same—Evidence—Acts and Declarations of Defendant.

Where, upon trial of murder, it was shown that defendant's bond was forfeited and that thereafter defendant returned and approached one of his sureties, apologizing to him in not telling him in advance. about his intended trip to Louisiana and that he did not blame him for not again becoming his bondsman, and it was not shown that defendant's purpose in going to Louisiana was to avoid trial; the same was inadmissible. Prendergast, Presiding Judge, dissenting.

### 10.—Same—Evidence—Declarations of Defendant.

Upon trial of murder, there was no error in admitting in evidence declarations of defendant a short time before the homicide to the effect that while he wanted no trouble with the deceased, yet, if he did have trouble, it would be serious and that he would kill out the entire crowd and the court could do as it liked with him.

### 11.—Same—Evidence—Threats.

Where there was no evidence in the record that defendant had deceased in mind when he remarked that he would use a certain pistol on a gentleman

that night, the same was inadmissible. Prendergast, Presiding Judge, dissenting.

**12.—Same—Evidence—Conversation Between Defendant and Deceased.**

Upon trial of murder, there was no error in admitting in evidence parts of a conversation between defendant and deceased just prior to the homicide.

**13.—Same—Charge of Court—Justifiable Homicide.**

Where, upon trial of murder, the evidence did not call for the court's charge, under the head of justifiable homicide, "Without resorting to other means such as retreat," etc., the same should not have been given. Prendergast, Presiding Judge, dissenting.

**14.—Same—Degrees of Murder—Charge of Court.**

A person who has been acquitted of murder in the first degree by being convicted of murder in the second degree can, upon new trial, be convicted of second degree murder on testimony showing first degree homicide, and the charge of the court, therefore, which may have been erroneous on this subject, was harmless error.

**15.—Same—Provoking Difficulty—Charge of Court.**

Where, upon trial of murder, the evidence raised the issue of provoking the difficulty, the court should have submitted this issue to the jury under a proper charge, but it was error to use the word, "Peacable," or other language of similar import in submitting the issue that defendant had the right to call on the deceased for an explanation. Prendergast, Presiding Judge, dissenting.

**16.—Same—Charge of Court—Weight of Evidence.**

Where the issue was sufficiently covered by the court's main charge, it was error to give a requested charge by the State directly pointing out specific acts and thus charge on the weight of the evidence. Following Parnell v. State, 51 Texas Crim. Rep., 620. Prendergast, Presiding Judge, dissenting.

Appeal from the District Court of Cherokee. Tried below before the Hon. L. D. Guinn.

Appeal from a conviction of murder in the second degree; penalty, eleven years imprisonment in the penitentiary.

The opinion states the case.

*Geo. S. King,* for appellant.—On question of change of venue: Randle v. State, 34 Texas Crim. Rep., 43; Cortes v. State, 44 id., 169; Barnes v. State, 59 S. W. Rep., 882; Gallagher v. State, 55 Texas Crim. Rep., 50, 115 S. W. Rep., 46; Dobbs v. State, 51 Texas Crim. Rep., 629.

On question of former conviction: Wyatt v. State, 124 S. W. Rep., 929; Brown v. State, 122 S. W. Rep., 565; Pickett v. State, 51 S. W. Rep., 375; Baines v. State, 43 Texas Crim. Rep., 490; Richardson v. State, 33 id., 518.

On question of dying declarations: Bateson v. State, 46 Texas Crim. Rep., 34; Lockhart v. State, 53 id., 589; Watson v. State, 50 id., 171.

On question of provoking the difficulty: Lockhart v. State, 53 id., 589; Burnett v. State, 51 id., 20; Sanders v. State, 50 id., 430.

On question of the court's charge on defendant's right to ask explanation: Shannon v. State, 35 Texas Crim. Rep., 5; Casey v. State, 50 id., 392; Lahue v. State, 51 id., 163; Keeton v. State, 128 S. W. Rep., 413.

On question of charge on provoking the difficulty: Castro v. State, 40 S. W. Rep., 985; Drake v. State, 45 Texas Crim. Rep., 273; Burnett v. State, 51 id., 20; Sprinkle v. State, 49 id., 224; King v. State, 51 id., 208; McCleary v. State, 57 id., 139.

C. E. Lane, Assistant Attorney General, and Norman & Shook, for the State.—On question of provoking the difficulty: Gaines v. State, 58 Texas Crim. Rep., 631, 127 S. W. Rep., 181; Fox v. State, 71 Texas Crim. Rep., 318, 158 S. W. Rep., 1141; Gray v. State, 61 Texas Crim. Rep., 454, 135. S. W. Rep., 1179; Cloud v. State, 69 Texas Crim. Rep., 76, 153 S. W. Rep., 892.

LUD T. WILLIAMS, SPECIAL JUDGE.—Appellant was convicted in the District Court of Cherokee County of the offense of murder and the punishment assessed was a term of eleven years imprisonment. Appellant was tried under this same indictment in January, 1912, and was convicted of murder in the second degree and punishment assessed at ten years confinement, but that conviction was set aside in the lower court.

There was an ice cream supper at G. P. Messer's residence in the northeastern portion of the county on the night of July 2, 1910. The appellant, the deceased and quite a number of other neighbors, male and female, assembled there that night. It was on this occasion that the homicide, out of which this conviction grew, occurred. The deceased and appellant were each at that time approximately 23 or 24 years old. The deceased, under the evidence, was the larger man. Estimates giving him the advantage in weight varying from twenty to about fifty pounds. The appellant's weight being generally estimated from 125 to 135 pounds. The deceased some month, or possibly a little more, prior to the homicide had an altercation with two younger brothers of appellant. One of appellant's brothers had a cut on his head as if he had been struck with a stick. The deceased said this trouble was over "the fixing of a fence." It is not shown how, if at all, this former difficulty concerned appellant, further than his two younger brothers were involved in it. Nor is it shown that he had any connection with or took any interest in it, except that some time after the difficulty between the deceased and the younger Sorrell boys, the appellant, in talking about the matter with the State's witness, J. F. Martin, stated to him (Martin) that he, the appellant, was not going to raise any racket with him (deceased), that he did not blame him as much as he did the other crowd or crew, "and then he told me that if they ever did have any trouble, or if I ever start, I am going to get the whole d—— business and then they can do what they please with me." This was after the trouble between deceased and the younger Sorrell boys, which the evidence shows occurred some time in the spring of 1910 and prior to the homicide in July, it being no more definitely fixed. Deceased had made serious threats against appellant, which had been communicated to him prior to the homicide. Appellant had taken his pistol to a

jeweler at Troup to be repaired about a month before the homicide, and had gone to Troup on the day of the homicide and gotten it back in good shape. On the night of the homicide the appellant and deceased reached Mr. Messer's residence about dark, the deceased arriving first. Quite a number of others also arrived about the same time and disported themselves about the premises. One at least of appellant's brothers also attended the gathering. The house fronted north. There was a front porch and a hall extending north and south between the rooms, and a rear addition with a porch fronting east. Shortly after arriving, appellant walked through this hall and approached deceased, who was seated, it seems, on the edge of the back porch or steps. The evidence is not entirely in accord as to just what language passed between them at this time, but we will not now go into the details of what was said here, or what ensued. It is sufficient for a general statement of the case to say that appellant invited the deceased to step aside with him on the plea that he wanted to have a conversation with him. Deceased at first demurred, but finally upon appellant's solicitation went; and all agree that they walked away together side by side and apparently upon friendly terms. They walked out through a side gate in the east line of the yard fence and to a stump some eighteen or twenty feet from the gate. They had not been gone through the gate but a few minutes, some say about five,—until three shots were heard, and the deceased came running back through the gate saying Pearl Sorrell had shot him. The three shots were in pretty close succession, but there was a greater time between the first and second than there was between the second and third. The injured party died about 3 o'clock that night. He was shot once just below the navel and this bullet went entirely through him and his clothes. This wound caused his death. There was another flesh or skin wound on the front and side near the hip, but this did not enter the cavity and was not serious. There was a wound or cut on the top of his head and a little to the left, and both the scalp and hat showed he had received a blow there.. His clothes were on fire in front of both body wounds. There is some divergence in the evidence as to the extent of the darkness, but all agree that it was dark. No one except the participants were present or saw the fatal difficulty, or heard what was said except one witness, who testified he saw the blaze of the last two shots and saw the bulk of the form of deceased coming away from the flash while the said last two shots were being fired. As to what transpired there between appellant and deceased after they left the yard, we are confined for information to the dying declaration of deceased and the evidence of appellant—in connection with the physical facts in the case. When deceased came back·through the gate he stated to someone that he was killed and asked them to get him to a bed to die on. This, we take it, is a sufficient general statement of the case for the present, and we will discuss other details in connection with the questions raised.

(2) The new law, abolishing the degrees of murder, was in effect at the time of the trial from which this appeal is·had. As before stated,

the appellant had been tried once before this under the old law and convicted of murder in the second degree. By various special pleas and motions, the appellant properly raised and presented the question that having been convicted of murder in the second degree and thereby acquitted of murder in the first degree, and second degree murder having been abolished by the statute, that he can not be tried for any higher offense than manslaughter. He presents his position on this subject from various angles, but all tending to the one position as above stated. His counsel, upon this question, has filed a very able, exhaustive and persuasive separate brief. This same question, however, has recently been before this court in several cases. The court has taken occasion to consider and discuss the same fully and has ruled adversely to appellant's contention on the point. We do not, therefore, now regard it as an open question in this State. Appellant's contention, in this respect, is overruled. Shaw v. State, 72 Texas Crim. Rep., 630, 160 S. W. Rep., 103; Cook v. State, 71 Texas Crim. Rep., 532, 160 S. W. Rep., 465; Hill v. State, 72 Texas Crim. Rep., 109, 161 S. W. Rep., 118.

(3) Appellant filed an application for a change of venue, alleging in substance that there existed so great a prejudice against him in Cherokee County that he could not expect a fair and impartial trial. His affidavit was properly supported by compurgators, but the State filed counter affidavits in statutory form and the issue of fact was therefore raised as to the existence or non-existence of prejudice to the extent alleged.

The homicide occurred in 1910 and this trial was had during the May term, 1913. There had been a former trial of this case, which resulted in a conviction of murder in the second degree and a penalty of ten years confinement assessed. This was in January, 1912. It also appears that there had been a former application for change of venue. At the last prior term of the court before the instant trial, the defendant was not present at a date when his case upon resetting was called for trial and his bond was declared forfeited. There are some things in the record about which there is but little, if any, controversy. It seems at the former trial of the case the sheriff was called upon to attach and bring to court a witness whose wife was sick, and during the thus enforced absence of the husband from the home the wife died. In the ensuing election an opponent of the sheriff sought to make political capital of this unfortunate incident. He had printed and distributed generally over the county at least three thousand circulars, narrating the occurrence, thus bringing this case into public-notice and under discussion in every precinct and neighborhood in the county. The evidence further shows that at the former trial of this case there was a large attendance composed of citizens from various parts of the county, who were present at court and heard the evidence and argument of counsel in the case and the verdict of guilty with the ten-year penalty. Upon another occasion, when appellant's bond was declared forfeited, it appears that there was some other case, or cases set for trial and there was an attendance upon court of a great number of citizens—wit-

nesses, jurors, etc., from the body of the county. At this time the rumor became prevalent that appellant had intentionally forfeited his bond and had fled to the State of Louisiana as a fugitive from justice. It is a fair presumption and fully borne out by the record in this case that these citizens who attended court, upon the occasions referred to, returned to their respective homes in the remote precincts of the county and there very naturally disseminated the news occurring at the county seat. In this connection it is further shown that several newspapers of general circulation in the county published accounts of these various court proceedings had in this case. None of these publications were bitter or unfair except possibly a short article appearing in the Rusk Sentinel, relative to appellant's arrest after his alleged flight. The article is as follows: "Deputy Sheriff Forest Reagan brought in Saturday Pearl Sorrell, who forfeited his bond at the last term of the District Court. When Forest goes after them, he generally gets them, and Sorrell will have to take a longer and more extended trip next time."

The evidence of thirty witnesses introduced by appellant, together with the examination of the jurors, which is also included in the bill of exceptions, together with the testimony of some of the State's witnesses introduced upon this point, established the fact, we think, that appellant's case had been discussed and was generally known in every precinct in the county. The evidence shows that his former conviction was commonly and generally well known. That his former bond forfeiture and alleged fugitive flight to Louisiana were equally well known. A statement that appellant had killed one or more men prior to the homicide in this case and was a bad man had also gained both general circulation and credence. Three of appellant's witnesses showed especially good opportunity to know the general consensus of public sentiment about over the county. These, the candidate for sheriff, who had canvassed the entire county; a collector whose occupation required him to fully cover all the territory within a radius of within twelve or fifteen miles of the county seat; the third was a trader whose business took him all over the county. In addition to these were his other twenty-seven witnesses from the various precincts, as far as we can judge of the county. They all, with one or two exceptions, say that appellant's case had been prejudged all over the county so far as they had opportunity to know, and that they had heard it frequently and generally discussed. That this prejudgment was against him, that the court's history of this case was generally known, including the fact of his former conviction and the reports concerning appellant above referred to.

To meet this the State introduced twenty witnesses. A great many of these witnesses testified that they believed defendant could get a fair and impartial trial in the county. Some of them said that the case, so far as they knew, had not been "generally discussed." But quite a number of them, if not a majority, upon examination showed that they themselves were fully conversant with the history of the case and all the steps that had been taken in it. The county attorney, Mr. Guinn, who was one of the State's witnesses, based his reason for his belief that

the defendant could get a fair trial "because of the confidence I have in the citizenship of the county, but not altogether though." If this were the true test, then it is not likely any change of venue would ever be needed from that county. Witnesses in other counties might also, with equal assurance, claim this high standard of citizenship for their respective counties, and thus the change of venue statute be abrogated.

The county superintendent was another State's witness, who testified he thought he could get a fair trial, but upon cross-examination it developed that this witness had been discussing the case quite freely himself, and that he was sufficiently conversant from some source with the facts to feel justified in making public the expression of his belief that the appellant got off light before for ten years, and further said that was his present opinion about it. An extended digest of the testimony of these witnesses would serve no good purpose. As above stated, while they in the main testify that they think the appellant could get a fair trial, yet they themselves show a familiarity with the case and everything that had been done in the case. That defendant forfeited his bond and his alleged fugitive flight to Louisiana. That he had been guilty of a similar offense before and just such other matters as appellant contended were prevalent talk in the county. Not all of the witnesses were thus familiar with the current talk, but a great number of them. We are of the opinion that the court should have ordered a change of venue in this case. Doubtless there are men in Cherokee County who never heard of this case, and it is without question that even those who had, if selected as jurors, would attempt to lay their prejudice aside and try the case upon its merits, but neither of these questions were the issue.

The Bill of Rights, under the head of "Guaranties" (art. 1, sec. 10, Constitution), provides, "In all criminal prosecutions, the accused shall have a speedy public trial by an impartial jury." This is intended to be a guaranty. It doesn't mean that eleven of the jury should be fair and impartial. It doesn't mean that the district judge shall force the defendant to trial with the hope of securing a fair and impartial jury. But it does mean that he must not put him to trial in a county unless the circumstances and conditions of the public sentiment are such that he feels able to give an absolute assurance that neither by accident nor design will any sentiment against the accused creep into the jury box, except such alone as is raised by the testimony heard upon the trial. The verdict of the jury should reflect the testimony in the case. The reflection should be a perfect one. Not a distorted or imperfect one. One crack in the mirror, one ripple upon the surface of the pool, are sufficient to destroy the trueness of the reflection. One improper juror destroys the integrity of the verdict. Where the great majority of the citizenship of a county is shown to be conversant with a case, and their minds have been poisoned with wild rumors against the accused, which possibly might not be admissible as evidence, where they have heard of his former conviction, and where general public sentiment is in the condition, as the testimony in this case indicates, we think it indeed a

risky thing to undertake to guarantee an impartial jury under such conditions.

As said by Judge Henderson in the Cortez case, "Prejudice is a sinister quality, and the very person whom it actuates may be unconscious of its existence." Witnesses frequently testify tnat they believe an accused could get a fair trial and in this they are honest. They are not given an opportunity, or possibly called upon to express their further opinion that with them a fair trial would mean the penitentiary or the gallows. As was held in the Randall case, prejudice, referred to in the statute, does not necessarily mean the prejudice against the defendant, but may and often with equal force does mean prejudice against his case. If upon another trial appellant should present his application for a change of venue and upon contest make substantially the same showing, as made upon this hearing, the venue of the case should be changed. Randle v. State, 34 Texas Crim. Rep., 43; Cortez v. State, 44 Texas Crim. Rep., 169.

(4) Bills of exceptions 4, 5 and 15 present questions relating to the admissibility of the dying declarations offered in evidence by the State. We think it is made sufficiently to appear from the evidence that the deceased, at the time the declarations offered were made, was properly imbued with the belief of the near approach of his dissolution, and that the objections upon that issue were fully met. We do not think that the record shows any such leading or pressing in order to induce the declarations as to reject them on that score, and the court was not, therefore, in error in admitting the declarations in general. We do not think, however, that the advice given by the witness Messer to the deceased, to the effect that he ought to have known better than to go out there, should have been admitted.

(4½) We think the court erred, as shown in bill No. 15, in permitting for any purpose the declarations of the deceased that "he was shot down like John Ross." This could but be an opinion of the deceased. If the deceased had not died and had been on the stand testifying, he would not have been permitted to have given such testimony—that is, that he was shot down like John Ross. We understand the rule to be that the knowledge of approaching dissolution is substituted for the solemnity of the oath, but that in all other respects the general rules of evidence apply, and that an opinion or conclusion is no more admissible as part of a dying declaration than it would be if the witness was upon the stand personally testifying. It is urged by the State that this testimony was not hurtful to the interest of appellant, as there is nothing in the record showing how John Ross was shot down, or that the jury were conversant with any of the facts surrounding his death. To so hold, we think, would be uncalled reflection upon the prosecution in this case. They were insistent upon the admission of this evidence even after objection had been made; and in the absence of testimony, either one way or the other, for us to presume it was not helpful to the cause which they represented and injurious to appellant's cause before the

jury would be a conclusion which we would not feel justified in indulging. The evidence was not accidentally, incidentally or inadvertently introduced. Where evidence of this character is intentionally and deliberately introduced in the record and there is nothing in the record to disclose what its weight or effect would probably be before the jury, and it is of such a character as could reasonably be hurtful, we feel that it is the duty of this court to presume that the party offering it was acting intelligently, and that the evidence so offered was helpful to the one and hurtful to the other.

(5) Bill of exceptions No. 6 is an objection to the admission in evidence, at the instance of the State, of a judgment nisi, rendered in January, 1913, declaring a forfeiture of appellant's bond for his failure to appear for trial. Evidence of flight is ordinarily accepted as an indication of guilt and is admissible. So also, upon the same theory, would be evidence showing or tending to show that appellant had intentionally absented himself from court in order to avoid a trial of his case. The judgment nisi, however, was an ex parte proceeding, having no legal weight or effect except in the matter of the bond forfeiture, and legally establishing no conclusion. For these reasons it should not have been admitted. It was taken in the absence of the accused, without an opportunity on his part to be heard on the issue. It was not and could not have been a final adjudication of any fact, and was, therefore, as stated, not admissible. The State, upon this issue, should be confined to evidence of the defendant's flight or intentional absence and should not be permitted to bolster the same up by an ex parte proceeding of the court.

(6) The evidence discloses that something like two months prior to the homicide, the deceased and two of appellant's younger brothers engaged in a difficulty or fight, which appears to have grown out of "fixing a fence." As growing out of this difficulty, it is alleged that deceased made some threats in the intervening time between then and the homicide, and this difficulty is one of the things that appellant claims he called deceased aside for, at the time of the homicide, to talk to him about. The merits of this difficulty, as such, are not material to any issue in this case, but the State upon one hand contended for malice on the part of appellant; and on the other hand manslaughter, and the necessary adequate cause were in part appellant's defense to the charge of manslaughter, then any knowledge or information brought home to appellant concerning this difficulty between his brothers and deceased would be evidence in view of these contending theories. In view of the fact that the case is being reversed, it is not necessary for us to pass upon defendant's bill of exceptions objecting to the admission of evidence showing that his brothers were convicted in the Justice Court of assault growing out of this difficulty with the deceased. The rule above announced will be sufficient to govern the admission and rejection of evidence on this issue upon another trial.

(7) By bill of exceptions No. 8 it is shown that while appellant was on the stand as a witness in his own behalf, the State was permitted to

ask him if it was not a fact that he had before been convicted upon a former trial in the case now being tried. Timely and full objections were made by his counsel, but were overruled by the court, and defendant was required to testify before the jury that he had been convicted upon a former trial in this case. The only qualification to this bill is that it was admitted under the defendant's plea of suspended sentence and that it is qualified by the charge of the court. Of this latter we will see later. We do not understand how the effect of an affidavit invoking the benefits of the suspended sentence law could be so far misinterpreted. The conviction of a felony, referred to in that statute, means a final conviction. The statute was passed for the benefit of those upon trial for their first offense. It was intended as a beneficent statute and not as a license to deprive one of a fair and impartial trial for which the Bill of Rights stands guarantor. It is true when one files an affidavit under this statute he opens the question of whether or not he has ever before been finally convicted of a felony. He may also, if he sees fit, and has especially invited it in the affidavit, in this way put his general reputation in issue. But the fact that he puts in issue the question of whether or not he has ever been convicted of a felony, by no means places upon him the necessity of carrying the additional burden before the jury that a former jury, upon a former trial of this same case, had returned a verdict of guilty, which for some reason had been vacated. This was clearly not the intention of the law. We are not sure that we quite understand the position of the State in its brief, with reference to this most grievous and unnecessary error. In one place they say in substance that by the affidavit for suspended sentence, the issue of former conviction was open and "for this purpose the question asked appellant by the State's counsel was a proper and legitimate one and the fact that appellant may have misinterpreted it and made the answer which he did, should not result in a reversal of the case, and this even though the fact had not already been well known to the jury as a result of appellant's conduct of the trial." The inference, as we read it, intended here is that by mistake the defendant answered with reference to his former conviction in this case, when such was not the purpose of the query. The bill of exceptions flatly contradicts this position, for it says the State was permitted to ask defendant "if it was not a fact that he had before been convicted upon a former trial in the case now being tried."

The State then in its brief takes the position that inasmuch as the jury already knew of appellant's former conviction, and inasmuch as defendant had testified in answer to questions from his own counsel, that he had never been convicted of a felony, etc., that "rather than being hurtful to the defendant from the peculiar facts of this case, it seems to us to have offered him an opportunity to explain what he meant by conviction and to relieve him of the danger of the jury thinking he had made a false statement when he said he had not been before convicted of a felony." But how did the jury as such have any evidence of his former conviction? Why should an accused be wrongfully

placed in the position that he is called upon to explain something that the jury should in no event, have ever known. True the State says that appellant accepted some jurors after they had testified upon their voir dire that they had heard of the former conviction. We do not know to what stress appellant was driven in accepting jurors, but admitting this contention of the State, these several jurors could not legally impart their personal information to the remainder of the jury. Again the State intimates in its brief that by the defendant's conduct of the case, this information of his former conviction had already been brought before the jury. We do not so read the record. True, appellant had filed certain pleas setting up his former conviction of second degree murder as an acquittal of any grade of offense higher than manslaughter; but all of these various pleadings and motions, relative to this issue, were disposed of, as we understand it, without the intervention of the jury and before the jury had been empaneled. In fact, before the application for change of venue had been overruled. This condition here shown but illustrates the reason why the change of venue should have been granted. No man should ever be tried before a jury who knew, or any part of whom knew, that a previous jury had convicted him upon a former trial of the same case. It is true jurors may say that this knowledge would not affect them and that they could lay it aside, but we know human nature too well and the first impression is too strong to be thus lightly disposed of. It was error to admit this fact in evidence, or even any reference to it, and it was of such a prejudicial character that we see no way that the court could have cured the error after it was once injected. As to what effect it had, the two verdicts themselves are a fair indication, the first was a ten years penalty and this last penalty was fixed at eleven years confinement.

(8) The testimony of Mrs. Streight, to the effect that some time subsequent to the difficulty between deceased and defendant's brothers and before the homicide, she passed along the lane running between the field of deceased and the field of defendant's father and that as she passed she saw defendant near the fence of deceased in a skirt of woods with a gun, and that the fence of deceased was up as she passed, but as she later returned the fence of the deceased was down. There is nothing in the bill of exceptions, nor so far as that is concerned in the statement of facts showing that this incident had any connection whatever with the homicide. Its tendency was prejudicial and the court by admitting it necessarily led the jury to believe that it was material upon some issue. We see no inference that the jury could have drawn from this testimony except one prejudicial to the rights of the defendant. Testimony of this character should never be admitted, unless there is either some direct or adequate circumstantial connection between the incident offered in evidence and the occurrence concerning which the trial is being had. To be admissible under circumstantial connection, the circumstances should be sufficient to meet the test of certainty required in cases of circumstantial evidence. What we have here said also disposes of the bills with reference to appellant going backwards

and forwards to his field and at times having a gun in the wagon.    There is no evidence in this record to show that this gun was being carried for the deceased, or even that it was in the personal possession of the appellant.    There are some other similar questions to the two above in the record and they will be controlled by the rule here announced, and will not be admitted unless there is first introduced evidence showing that they had some real connection with or bearing upon the homicide.

(9)    There are two bills of exception with reference to the testimony of the witness Fitch.    It appears that appellant was not present in court one time when his case was set for trial, but that instead of being in court he was in Louisiana and his bond was declared forfeited. According to Mr. Fitch's testimony, after appellant returned he approached him (Fitch) and apologized to him for not telling him in advance about his intended trip to Louisiana, and in this connection told the witness that he did not blame him for not again becoming his bondsman.    It seems by one of the bills of exception this testimony was admitted as original evidence, and by another admitted for the purpose of impeaching appellant and for which a predicate had already been laid.    This evidence could only have been admitted originally for the purpose of showing that appellant had intentionally avoided being present for trial at the time set.    In other words, as showing an attempt to avoid trial under the indictment.    We see nothing in this particular testimony to indicate or tend to show that such was appellant's purpose in going to Louisiana.    The mere fact that he apologized to his bondsman for not telling him in advance of his intended trip is no indication, as we see it, that he had made the trip with no intention of returning in time for trial.    Not being admissible as original evidence upon the ground that it was not material to any issue in the case, no predicate and impeachment could be laid and met by it.    Unless there is something more to this testimony than is shown by the bill of exceptions and something sufficient to at least amount to an intimation that the defendant had wilfully left with no intention of returning in time for trial, then this evidence upon another trial should be excluded.

(10)    The court did not err, as complained of, in bill of exceptions No. 12, in admitting the testimony of Jim Martin, to the effect that in a conversation with appellant a short time before the homicide the appellant said, "He did not want any trouble with the deceased, but if they did have trouble it would be serious trouble, that he would kill out the entire crowd and then the court could do with him as they pleased."    While this testimony was offered out of the regular order, still if admissible, its admission out of order was a matter within the discretion of the trial court, unless abuse is shown.    We see nothing to indicate that the court abused his discretion in this matter.    On the contrary, we think this ruling was correct and proper under the circumstances, and we further think that if there be any objection at all to the testimony, it would go to its weight rather than to its admissibility.

(11)    By the witness Rooks it was shown over appellant's objection that he was present in the town of Troup on Saturday evening (the

homicide occurred that night) when appellant received his pistol from the man who had repaired it for him. That the pistol was in a box and that appellant threw the box up containing the pistol and caught it in his hands remarking at the time that he would use that gentleman that night. Appellant upon cross-examination had denied making this remark, and we presume that the evidence was offered both as original and impeaching testimony; for if admissible as one it was admissible for both purposes. As stated before in this opinion, testimony of this character is only admissible when there is other evidence tending directly to show with reasonable certainty that the remark had application to deceased and that the appellant, at the time he made it, had the deceased in mind; an accused is not to be tried for every idle remark which he may make. There are other things in unlimited numbers which he might have had in mind as the object of this remark other than the difficulty with the deceased. There is no evidence in the record tending to show that appellant knew that deceased would be at the ice cream supper that night, even if appellant had already made up his mind to attend. There is nothing in the evidence to show that appellant had any right to anticipate a meeting with the deceased that night. Even if true none of these things could indicate with any degree of certainty that deceased was the object of the remark. There is evidence that the deceased was not in the habit of attending entertainments of this character. True none of these things that we are discussing are in the bill of exceptions and possibly we, strictly speaking, are violating the rules in going outside, but if that be true, it is equally true that there is absolutely nothing in the bill of exceptions to indicate that the testimony was admissible. However, we are discussing this question now not so much for the purpose of passing upon the bill of exceptions, but on the contrary in view of another trial. Upon another trial unless there be evidence introduced tending to show with reasonable certainty that the deceased was the ultimate object of this remark, then this testimony should be rejected. Holley v. State, 39 Texas Crim. Rep., 301, 46 S. W. Rep., 39; Gaines v. State, 53 S. W. Rep., 623.

(12) Bills of exception 16 to 18, inclusive, are objections to the introduction of parts of the conversation between the appellant and deceased at the back gallery just prior to the homicide. The chief objection being that some of the statements made by the deceased were merely opinions, and others that the questions were leading. This was the conversation between the parties and was, of course, admissible just as it occurred without reference to whether it was composed of opinions or statements of facts. Some of the questions were rather leading but this can not always be avoided and is a matter largely for the discretion of the trial court.

(13) While there seems to be no exception to the second paragraph of the court's charge under the head of justifiable homicide, that is the paragraph instructing the jury about resorting to other means, retreat, etc., yet in view of another trial we think it proper to suggest that we do not think that the evidence in this case calls for said paragraph.

Nor was the paragraph, with reference to the presumption arising from the use of a deadly weapon by the deceased, called for by the facts in evidence.

(14)  There is some criticism of the court's charge for submitting the case to the jury under the murder statute as it now exists, and we think that the criticism is correct to the extent that under the decisions of this court, since the passage of the new murder statute, in cases in the condition this case is in, the defendant should be tried under the old second degree murder statute and for manslaughter. As stated, this court has passed on this question in several cases and it is not now open. (See Shaw's case and other cases cited, supra.)  In view of the fact, however, that under the established law of this State a person who has been convicted of murder in the second degree and thereby acquitted of murder in the first degree can thereafter be convicted of second degree murder on the testimony showing conclusively a first degree homicide, we fail to see how this error could be injurious to the defendant.

(15)  Appellant also makes the contention that the facts in this case do not raise the issue of provoking a difficulty, and that the court erred in submitting this issue to the jury.  In this connection he makes further complaint on the manner in which the issue was submitted, if it be held that provoking a difficulty was in the case, and of the court's refusal to give his special charge upon this subject.  From a reading of a great many cases we understand that the following combination of facts must exist before a charge on provoking a difficulty, or abridged right of self-defense, is called for or permitted:

(1)  The interview or meeting must be sought by the defendant for the purpose of provoking a difficulty.  Shannon v. State, 35 Texas Crim. Rep , 2; Airhart v. State, 40 Texas Crim. Rep., 470.

(2)  When the meeting occurs the defendant must do some act or use some abusive and insulting language to the deceased or injured person, reasonably calculated to provoke the difficulty.  Hjeronymus v. State, 46 Texas Crim. Rep., 157.

(3)  The act or acts done, or abusive or insulting language used, must be done or used, as the case may be, with the intent of provoking the difficulty.  McCandless v. State, 42 Texas Crim. Rep., 58.

(4)  The act or language just referred to must actually provoke a difficulty in which the deceased or injured party is the aggressor.  McCandless v. State, supra.

Some of the cases hold that the court should point out in his charge the evidence upon which the charge on provoking a difficulty is based. Carter v. State, 37 Texas Crim. Rep., 403; Mozee v. State, 51 S. W. Rep., 250.  But this rule does not appear to have met with approval in later cases, the fear being expressed that it approached too near a charge upon the weight of evidence.  In the McCandless case, above cited, it is said that the charge should be couched in general terms and that the court "should instruct the jury, in effect, that if the defendant sought the occasion for the purpose of slaying his adversary (if he did so) and having found him did some act or used some language, or did

both, as the case may be, with the intent to produce the occasion and bring on the difficulty, and that the same under the circumstances was reasonably calculated to produce a difficulty, and on such account his adversary attacked him and he then killed his adversary in pursuance of his original design, then such killing would be murder."

The above, however, was not there given, nor is it here given, as a form for a charge, but is merely a suggestion of the essential elements. Most all of the cases announce the rule to be that before a court is justified in charging upon provoking a difficulty at all, he must be able to point out definitely "to put his hand on" the testimony which justifies the charge. Some of the cases speak very reverently of "the inalienable right of self-defense," and suggest that the rule in cases of provoking a difficulty, or an abridgment of this right in anywise can only be justified upon the ground of estoppel. Some of the older cases say that it is based upon the legal maxim that "a man may not take advantage of his own wrong to gain favorable interpretation of the law. He seeks the law in vain who offends against it." And others, "that one can not willingly and knowingly bring upon himself the very necessity which he sets up for his defense." All of the authorities are to the effect that where a difficulty is provoked but with no intent to kill or do serious bodily injury, and the one provoking the difficulty is driven to the necessity of killing in protection of his own life that he is in such a case only guilty of manslaughter. We have carefully considered the evidence bearing upon the question of provoking a difficulty to first determine whether such issue is in the case.

In addition to the statement of the case made in the beginning of this opinion, we state the further facts shown by the record to be in evidence. The State's witness Joe Hamilton testified that the appellant went to the deceased, who was sitting on the edge of the rear porch or steps of Mr. Messer's house on the night of the ice cream supper, and further testified as follows: "Pearl just told Tom to come on out, that he wanted to talk with him. Tom told Pearl no, that he did not want to go, that he wanted to get him out there and kill him. Pearl then said no, that he only wanted to talk with him. Tom then went on with Pearl." This witness further stated that Pearl in that conversation told Tom (meaning the deceased) "that if he was as game as he used to be that he would come," and that Pearl then went.

By another witness it is shown that when the appellant asked the deceased to go out with him, that the deceased got up and replied, "If he wanted to fight to fight there, and Sorrell said no, we will go out here. I just want to talk with you. Tom said something then but I did not hear what it was, and then Sorrell said, 'If you are as game as you used to be you will go with me,' and they then went on together." This is a sufficient statement of the State's theory of what was said there.

The appellant's theory, with reference to this conversation, is probably best shown by his own testimony upon this point. He contended that he had heard of threats made by the deceased against him and of the difficulty which the deceased had had some time in the spring with

appellant's two younger brothers, and 'that he had never seen the deceased until the night of the ice cream supper. That as he, the appellant, went out to the well and started back he saw the deceased sitting there and walked up to him and told him that he would like to talk to him. . "I wanted to talk to him about the threats that he had made about my life. Mr. Cox and Mr. Jennings had told me about his threats against me. I just wanted to ask him about those threats, and also about the way he had been treating my minor brothers. When I told him that I wanted him to come on and have a talk with me, or that I wanted to talk with him, he just raised up and said no, 'if you want to fight, fight here.' I then told him I did not want to fight him. That I just wanted to have a friendly conversation with him. He then got up and me and him left there and went out towards the gate." By all the evidence, it is shown that they walked off apparently friendly, side by side out through the gate in the side fence of the yard in the comparative darkness some distance, probably twenty or thirty steps from the house, and that in a very few minutes three shots were heard and the deceased came back through the gate towards the house saying the appellant had shot him. These shots were fired in rapid succession, but there was more intervening time between the first and second than the latter two shots.

The State's only testimony as to what happened out there in the dark at the place of the homicide was through the dying declarations of the deceased. The State's witness Davis testified that the deceased, in a dying declaration made to him, stated that when they got out there the appellant commenced cursing the Normans (who it seems were friends of the deceased) and that he told the appellant not to do that, that he could not stand it, and appellant replied that he would have to stand it, and when appellant said that he hit him (deceased) over the head with a pistol, and that when appellant hit him with a pistol over the head the deceased grabbed the pistol and had hold of it when he was shot. On cross-examination he said, "I never heard him make any statement that he grabbed Sorrell." This, as we understand it, presents the State's theory in chief of the manner in which the difficulty arose, and if this be true the doctrine of provoking a difficulty could not be in the case. Under this testimony regardless of the intent in seeking the meeting and regardless of the sufficiency of the provocation given to provoke the difficulty, or the intent with which the same was given, the fact clearly remains that the deceased was not provoked into beginning the difficulty and did not in fact begin the difficulty, but on the contrary the difficulty was begun by the appellant. As we have seen under the cases cited, this could in no event bring this case within the rule.

Under the appellant's theory, as shown by his own testimony, he invited the deceased out for the purpose of a friendly talk with him over the threats that he had heard as having been made by deceased and with reference to the trouble between the deceased and his two younger brothers. Appellant testified, "When we got there I just told Mr. Barker that I understood he had threatened my life and I just wanted

to know why he did it and talk with him about it. He replied to me and said that he understood that I had threatened his life, and I asked him who told him that I had threatened his life and he said Arthur Norman, and I said if Arthur told you that he is a damn lie. Just as I said that Barker struck me. He just struck me with his fist on my body. When he struck me he grabbed me and as he grabbed me I ¡drew the pistol and he hit me again and then I hit him with the pistol. . . . I hit him over the head with it. When I hit him with the ·pistol I was trying to knock him loose from me, but when I struck him with the pistol it did not knock him loose and I drew back to hit him again and he grabbed the gun by one hand and me by the throat with the other and cursed me and said he would kill me." Appellant further testified in this connection that the gun went off accidentally the first time and when he had no control of it, and that while they were scuffling over the gun, the deceased having him by the throat with one hand and the gun with the other, that he finally managed to turn the gun on the deceased and shot him twice. Under this theory, if true, provoking a difficulty would not be in the case, because appellant's purpose and acts were all of a conciliatory character, and the deceased, according to appellant's statement, committed an unprovoked assault upon him which got to the point where appellant's life was endangered. There is, however, another version of this case as developed through the testimony of the witness Messer, at whose house the ice cream supper was being held and the homicide occurred. Mr. Messer, in testifying to the dying declaration made to him by the deceased to the effect that after the deceased had gotten outside the yard with appellant, the appellant made some derogatory remark with reference to something the Normans were doing or had done, and the deceased denied that the Normans had done this or were doing it, and the dying declaration of the deceased, then proceeds as follows: ;"And that Pearl then cursed him (deceased) and told him they were, and deceased said, 'Pearl, do not curse me.' He said he told Pearl he could not take it and that Pearl cursed him again and told him he had to take it, and he said then he grabbed Sorrell, and as he grabbed Sorrell, he (Sorrell) hit him on the head and brought the gun down and the shooting commenced. He said that as he grabbed Sorrell, Sorrell hit him on the head and brought the gun down and the shooting commenced." On cross-examination this witness further testified as to the dying declaration, "He just said he (deceased) grabbed him (appellant). He said Sorrell then hit him over the head with a pistol. He did not say Sorrell hit him just as soon as he grabbed him, but said he grabbed Sorrell and Sorrell hit him." If this last dying declaration be a true version of what occurred at the immediate time of the homicide, then provoking a difficulty was in the case. As the rule is that the court must charge upon every phase of the case presented by any testimony, howsoever slight, it became the duty of the court to charge in this case the law with reference to the doctrine of provoking a difficulty. This charge should, of course, be carefully drawn to cover the particular facts in evidence in this case

which justify it, and worded in such a way that the jury could not misapply it to other facts and circumstances. Having thus decided that the court was correct in submitting the doctrine of provoking a difficulty as part of the law of this case, the appellant's contention to the contrary will, of course, be overruled and we next come to consider his objections to the charge upon that issue as given.

(16) In this connection the court instructed the jury that appellant "had a right in law to invite deceased off from the crowd for the purpose of peaceably discussing and settling with him (Barker) any previous difficulty between deceased and his (defendant's) brothers, or any threats, if any, etc." Appellant made timely objections to this charge on account of the use of the word "peaceable." As this opinion has already grown lengthy, though seemingly unavoidably so to the writer, we content ourselves by a statement that under the authorities in this State the use of the word "peaceable" or other language of similar import in this connection is error. It places a burden upon the appellant not placed there by law. The court in charging on provoking a difficulty ordinarily presents the State's case affirmatively, as was done in this instance, from the State's viewpoint. The appellant is then entitled to the converse of the proposition from his viewpoint untrammeled by any extra burden or insinuation. Duke v. State, 61 Texas Crim. Rep., 19, 133 S. W. Rep., 432; King v. State, 51 Texas Crim. Rep., 208; McCleary v. State, 57 Texas Crim. Rep., 139. As seen the court undertook, after having charged on provoking a difficulty, to charge the converse of the proposition. With the exception above pointed out these charges presenting the appellant's side of this issue, seem to have been correct as far as they went, but we think that the charge should have gone further and applied the law to the facts substantially as it is done in appellant's requested charges Nos. 1 and 8. In other words, the jury should be told that appellant had the right to call the deceased aside for the purpose of having a conversation with him with reference to threats or the former difficulty with his brothers, etc., and that if deceased assaulted appellant that appellant's right of self-defense would not be impaired. The jury should also be told plainly that if the appellant provoked a difficulty but with no intention to kill the deceased, he would not be guilty of a higher grade of homicide than manslaughter. The above suggestions are not intended as a form of the charge, but merely calling the court's attention to the point.

Appellant's requested charge No. 5 is a correct enunciation of the law as we see it, but if the suggestions hereinbefore made are met in the main charge, this issue will be sufficiently covered without this special charge, nor will the special charge No. 7 be necessary. The other special charges all refer to evidence which has been excluded by rulings made in this opinion and to conduct of prosecuting attorneys, which will not likely occur upon another trial. So we see no good purpose to be served by discussing these matters at this time.

The State's requested charge No. 1, which was given by the court, we think, was error. This issue was sufficiently covered by the general

charge and to give the special charge directly pointing out specific acts was upon the weight of evidence. Parnell v. State, 51 Texas Crim. Rep., 620.

The record in this case is voluminous, containing something over four hundred pages. We have undertaken to dispose of all of the issues essential for another trial as briefly as the questions presented would permit. For the errors pointed out, this cause is reversed and remanded.

*Reversed and remanded.*

PRENDERGAST, PRESIDING JUDGE.—I believe the judgment should be affirmed, and dissent from its reversal.