The witness was then asked if he knew the name of the house. He answered:

"I don't know that it had such a name as you would speak of a place as a bank or the Cosmopolitan Hotel. It was spoken of to me as being Mr. Bell's gambling house up there, and folks were jumping on me about it."

[3] Various objections were urged to this, which we think were well taken. This character of testimony is not admissible. The fact that people told him that it was Bell's gambling house was not admissible. If it was Bell's gambling house, this fact could be shown by facts and circumstances attending it; but control and ownership could not be proven in this manner. The authorities are pretty clear upon this proposition.

[4] Exceptions were reserved to the charge and refusal to give special instructions. Among others, the court was requested to instruct the jury to the effect that defendant was not on trial for playing at or betting on any game prohibited by law, and the evidence to the effect that the defendant during the fall of 1917 played and bet on games of cards, which the evidence shows were played in the rooms under discussion, would not

constitute a basis for a conviction for keeping and permitting cards to be played on the premises.

We are of opinion this charge should have been given under the facts. It is a different offense to play or bet at cards from that of which appellant was charged, to wit, keeping a gaming house, or permitting cards to be played in the house under his control. The jury, therefore, should have had this, or a similar, charge given them, to the effect that they could not convict appellant for betting at cards under an indictment charging him with keeping a gaming house.

[5] There was evidence to the effect that, in a conversation between Robinson, owner of the house, and the defendant, when he surrendered his lease, appellant agreed to assist Robinson in finding a renter. This appellant did, and appellant later told Robinson that Will Campbell would rent the place, and a contract was made between Robinson and Campbell, apparently, if not in fact, through the intervention of appellant. Appellant asked the court to instruct the jury that under this testimony he would not be responsible for keeping the house; that he must be connected with it in some way, and this although appellant may have known or believed that Campbell intended running a gaming house.

We are of opinion that there must be more testimony than the mere fact that he induced Robinson to rent Campbell the premises, knowing or believing that Campbell might carry on gaming in the rooms, to predicate conviction. This might be considered as a circumstance, along with other circumstances, to show whether or not he was interested in the house; but the house did not belong to appellant, and he was not shown to have any interest in it, further than as agent of Robinson in renting to Campbell. He may have known or believed Campbell intended to permit gaming in the rooms, yet not be guilty under the indictment. This of itself would not constitute him a keeper of a gambling house. There must be other facts and circumstances to show his connection with it; and if the jury should believe that his connection with the house was simply to obtain a renter for Robinson, and himself not further interested in it, this would not constitute him a principal or a keeper, or being interested in keeping.

The judgment is reversed, and the cause remanded.

---

BEAUPRE v. STATE. (No. 4911.)

(Court of Criminal Appeals of Texas. Nov. 13, 1918.)

1. CRIMINAL LAW ⚖️451(3)—OPINION EVIDENCE—STATE OF MIND.

In a prosecution for murder, evidence of a physician called to attend deceased, who was defendant's wife, that in his opinion defendant's

grief was feigned, was not inadmissible, as being an opinion; it being a statement of an effect produced upon the mind.

**2. CRIMINAL LAW ☞366(4)—EVIDENCE—RES GESTÆ.**

In a prosecution for the murder of defendant's wife, evidence that, when defendant approached her after the infliction of the injury from which she died, she pushed him away and frowned at him, was admissible as res gestæ.

**3. CRIMINAL LAW ☞462—EVIDENCE—ADMISSIBILITY.**

In a prosecution for murder of defendant's wife, testimony of a witness that in his opinion defendant could not possibly have gotten home, committed the murder, and gone out and summoned help within the time charged, was properly excluded.

**4. CRIMINAL LAW ☞193½—FORMER JEOPARDY—CONVICTION OF OFFENSE OF LESSER DEGREE.**

In a prosecution for murder committed February 8, 1911, at which time murder was divided into two degrees, where a trial in 1911 resulted in a hung jury, but a subsequent trial resulted in a conviction of murder in the second degree, the acquittal of murder in the first degree by conviction in the second degree did not on a subsequent trial, preclude a trial for murder, and require a trial for manslaughter only.

**5. HOMICIDE ☞282 — MANSLAUGHTER—SUBMISSION OF ISSUE.**

In a prosecution for murder, it was not error to refuse to submit the question of manslaughter, where neither adequate cause nor passion was shown under the evidence.

**6. HOMICIDE ☞282—AGGRAVATED ASSAULT—SUBMISSION OF ISSUE.**

In a prosecution for wife murder by defendant, shown to have been committed with a hammer, in the absence of evidence that there was no intention to kill, the issue of aggravated assault was not raised, so as to require submission thereof to the jury.

Appeal from District Court, Ellis County; F. L. Hawkins, Judge.

O. P. Beaupre was convicted of murder in the second degree, and he appeals. Affirmed.

See, also, 135 S. W. 547, and 70 Tex. Cr. R. 19, 156 S. W. 625.

E. B. Hendricks, Asst. Atty. Gen., for the State.

PRENDERGAST, J. Appellant was convicted of murder in the second degree and assessed the lowest punishment.

This is the third appeal in this case. The first was an appeal from a habeas corpus hearing denying him bail, and is reported in 135 S. W. 547. The second is reported in 70 Tex. Cr. R. 19, 156 S. W. 625. In the second appeal a statement was made, making it unnecessary at this time to make another. On said trial appellant himself testified. On this trial he did not. On said second appeal he contended that the evidence was insufficient to sustain his conviction. On this appeal he makes the same contention. The evidence on this trial was as strong, if not stronger, against him, showing his guilt, than on the previous trial. On the previous appeal this court expressly held that the evidence was sufficient, and it adheres to that holding.

[1] Appellant on this trial, as he did on the previous trial, objected to the testimony of Dr. Embree, a physician who was first called to see, and did see, deceased soon after she was fatally knocked in the head with a hammer, to the effect that appellant's apparent grief at deceased's condition at the time, in his opinion was not real, but was feigned and simulated; the witness having testified as to what appellant did and said at the time. This court held against appellant on this point on the previous trial, and now adheres thereto. This evidence was admissible under the well-established principle by the many decisions of this court and text-writers to this effect:

"An opinion, so far as it consists of a statement of an effect produced on the mind, becomes primary evidence, and hence admissible, whenever the condition of things is such that it cannot be reproduced and made palpable in the concrete." 1 Branch's Ann. P. C. § 131, and the following cases cited by him: Miller v. State, 18 Tex. App. 232; Clark v. State, 28 Tex. App. 195, 12 S. W. 729, 19 Am. St. Rep. 817; Graham v. State, 28 Tex. App. 582, 13 S. W. 1010; Garner v. State, 28 Tex. App. 561, 13 S. W. 1004; Meyers v. State, 37 Tex. Cr. R. 210, 39 S. W. 111; Holland v. State, 60 Tex. Cr. R. 122, 131 S. W. 563; Harris v. State, 62 Tex. Cr. R. 240, 137 S. W. 373; Powdrill v. State, 62 Tex. Cr. R. 442, 138 S. W. 114.

Dr. Embree further testified, without objection, that when appellant attempted with a wet rag to wipe the blood off of her face she said, "Quit!" that she did not take hold of or caress him; "it was the reverse; it was kind o' pushing Mr. Beaupre away—she was;" and that, when he and one of the policemen were standing together, appellant attempted to wipe her face, he said to the policeman, "She doesn't want him to do that; make him quit," and he thought the policeman did stop him; and that, when he saw appellant's actions and heard what he said, "I did not think that the defendant's conduct was real; I thought it was more of a feigning condition, and for that reason the policeman made him get up out of the floor."

[2] The court did not err in permitting Mrs. Musgraves to testify that Mrs. Beaupre, deceased, kept pushing him (appellant) away and frowning for him to go away from her; "just kept pushing and shoving him away and seemed to want to get rid of him," in answer to the question of what Mrs. Beaupre's attitude toward him was every time he approached her. This evidence was also admissible as a part of the res gestæ of what occurred very soon—almost immediately—after deceased had been struck as stated, and Mrs. Musgraves and others gathered in and were present to render her whatever assistance and relief they could. Besides, Mrs. Musgraves testified that appellant was in the middle of the bed right over Mrs. Beaupre, holding her and asking her:

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

" 'Why don't you speak to me? You have been stubborn, but speak to me now.' She said something and pushed him away. I didn't understand what she said. She kept pushing him away." And further: "Every time he would take a hold of her she would keep pushing him away and frowning." No objection was made to the testimony of Mrs. Musgraves, just recited.

Mr. Hauk, a policeman who was called and reached deceased soon after she was injured, testified, without objection, that appellant "tried to put his hands on his wife to caress her or something, and she pushed him back and would not allow him to talk to her or touch her. * * * I saw her push Mr. Beaupre away a couple or three times."

The state proved that appellant reached the home where his wife was alone at about 10 o'clock at night; that two witnesses, who lived very close to him, one in 200 feet and the other a little further, in a different direction, some 10 or 20 minutes after he reached home, heard the screams of a woman, which they said was in the direction of appellant's; that very soon thereafter appellant went rapidly from his residence to one of his neighbors, just a little more than 200 feet away, and called for help. His neighbors responded, and at once went to his residence and found his wife knocked in the head with a hammer.

[3] Mr. Self, who testified for appellant, swore that he went out on the same street car that appellant did, and went just one block from where appellant got off to go to his home, to where he got off to go to his; that he went home. He tells what he did— hung up a picture and did various other things that caused delay—and that he was attracted by the appellant being at said neighbor's calling for help. The court committed no error in refusing to permit Mr. Self to testify, the state objecting, that in his (witness') "opinion the defendant could not have possibly been guilty of the offense charged, and could not have traveled from the point where witness saw him last, before he started to his home, to have made the assault upon his wife, and have gotten to the place where he saw him next by any possibility."

[4] The indictment alleged, and the proof showed, that deceased was killed on the night of February 8, 1911. At that time murder was divided into two degrees, first and second, under our law. He was first tried in Dallas county in 1911. The trial resulting in a hung jury. The venue was then changed to Ellis county, where he was tried a second time, and convicted of murder in the second degree, thereby acquitting him of murder in the first degree. Because of the statute doing away with murder in degrees by the act of 1913 (Acts 33d Leg. c. 116 [Vernon's Ann. Pen. Code 1916, arts. 1140, 1141]), and his acquittal of murder in the first de-

gree, appellant contended on this trial that he could not be tried for murder at all, but could only be tried for manslaughter. This has been uniformly held against him. Cook v. State, 71 Tex. Cr. R. 537, 160 S. W. 465; Shaw v. State, 71 Tex. Cr. R. 632, 160 S. W. 103; Andrus v. State, 73 Tex. Cr. R. 334, 165 S. W. 189; Sorrell v. State, 74 Tex. Cr. R. 510, 169 S. W. 299; and other cases since then. We adhere to these decisions.

[5] The court did not err in not submitting the question of manslaughter to the jury. This offense was not raised by the evidence. There was neither adequate cause nor any passion thereby shown. This was also held by this court on the previous appeal.

[6] On the former appeal this court held that the "hammer in the hands of a vigorous male would be a deadly weapon," and if such proof had been made on that trial a charge submitting aggravated assault would have been wholly uncalled for. On this trial that proof, uncontradicted, was made. In addition, the uncontradicted proof showed that the hammer was iron or steel, weighing 1 pound and 4 ounces. The iron part, the hammer itself, was 3 inches long, the diameter of the head a little over half an inch, and the handle 14 inches long; also that the wounds inflicted on deceased's head with this hammer were necessarily fatal and directly caused her death. There was no evidence that there was no intention to kill, and none from which an inference could be properly drawn. Hence aggravated assault was not raised on this trial, and the court did not err in refusing to submit any such question.

The judgment is affirmed.