PHILIP BROOKINS v. THE STATE.

No. 2535. Decided June 18, 1913.

Rehearing denied June 27, 1913.

**1.—Murder—Evidence—Dying. Declarations.**

Where, upon trial of murder, a proper predicate was laid, there was no error in admitting in evidence the dying declarations of deceased. Following Hunnicutt v. State, 18 Texas Crim. App., 498, and other cases.

**2.—Same—Charge of Court—Murder in the Second Degree.**

Where, upon trial of murder, the court in his charge on murder in the second degree, required the jury to find that the killing must be done with implied malice which term he fully defined, a complaint thereto that it eliminated from the consideration of the jury the charges on manslaughter and self-defense was untenable, as the court, in other portions of the charge, had fully submitted these issues. Following McGrath v. State, 35 Texas Crim. Rep., 413, and other cases. Distinguishing McDowell v. State, 151 S. W. Rep., 1049; Anderson v. State, 65 Texas Crim. Rep., 365; Best v. State, 58 Texas Crim. Rep., 327.

**3.—Same—Adequate Cause—Manslaughter—Charge of Court.**

Where, upon trial of murder, the issue of manslaughter was not raised, but the court, nevertheless, submitted the same, properly defining adequate cause, there was no error inasmuch that no statutory adequate cause had been shown. Distinguishing Rogers v. State, 67 Texas Crim. Rep., 467.

**4.—Same—Self-defense—Charge of Court—Apparent Danger—Threats.**

Where, upon trial of murder, the evidence did not raise the issue of actual or apparent danger other than danger incident to or growing out of threats, and the court properly submitted a charge on self-defense as applicable to the facts, there was no error.

**5.—Same—Charge of Court—Threats.**

Where the State offered no testimony that the alleged threats by the deceased had not in fact been made, and this matter was brought out only by defendant in a feeble way on cross-examination of the State's witness, there was no error in the court's failure to charge the jury that the defendant would have the same right to act in self-defense as if the threats had been actually made; the court's charge being sufficient in other respects.

Appeal from the District Court of Harrison. Tried below before the Hon. H. T. Lyttleton.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*Beard & Davidson,* for appellant.—On question of the court's charge on murder in the second degree: McDowell v. State, 151 S. W. Rep., 1049, and cases cited in opinion.

On question of court's charge on manslaughter: Rogers v. State, 67 Texas Crim. Rep., 467, 149 S. W. Rep., 127.

*C. E. Lane,* Assistant Attorney-General, for the State.—On question of court's charge on self-defense: Swain v. State, 48 Texas Crim. Rep., 98; Fuller v. State, 95 S. W. Rep., 1039; McDowell v. State, 55 Texas Crim. Rep., 596; Lundy v. State, 59 Texas Crim. Rep., 131, 127 S. W. Rep., 1032; Branch's Crim. Law, sec. 482.

HARPER, Judge.—Appellant was convicted of murder in the second degree and his punishment assessed at twenty-five years confinement in the State penitentiary.

There is but one bill of exceptions in the record. In it it is claimed that the testimony of Dr. G. D. Mahon ought not to have been admitted in evidence. The doctor testified that he was called to see Dan Boyd, deceased, shortly after he was shot; that he examined the wound and found it was a fatal one, and so informed Dan; that Dan said he believed he was going to die and that he did not mind dying. That he told Dan he was going to die, and he (the doctor) told him he wanted to know about the matter, and the cause of the trouble, when Dan told him: "He said he and Philip Brookins never had any cross words in their life; that Philip came by that evening and talked with him a little while and said he was going up and kill Eli Collier, seemed to

be mad at Eli and he was going up there and kill him, and Dan said he advised him to go on home and not get in trouble, and he went on up to Eli's and afterwards came back down there. When he came back down Danny said he was out in his lot putting up the mules or feeding them and was coming out of the gate. Think he said he had put his mule up and coming out of the gate and kinder stooped over to latch the gate or chain it when he was shot. He said he didn't know Brookins was there. He said he was coming out of the gate when he was shot. I examined around the corner of that house and saw some tracks there. I also picked up an empty Winchester shell right there on the ground. I found the shell right there at the corner of the house where the tracks were. The moon was shining and this shell was in the moonlight. Part of the tracks were in the shadow of the house and part were in the moonlight. The tracks were right at the corner of the house. It is my opinion that gun-shot wound killed him. I left there about 11 o'clock that night."

By the testimony it is made clear that deceased knew he was going to die at the time he made this statement to the doctor, and in fact did die before daylight next morning, and under such circumstances under all of our decisions the testimony was clearly admissible. Hunnicutt v. State, 18 Texas Crim. App., 498; Pierson v. State, 18 Texas Crim. App., 524; White v. State, 30 Texas Crim. App., 652; Taylor v. State, 38 Texas Crim. Rep., 552; Brande v. State, 45 S. W. Rep., 17, and authorities cited in Branch's Crim. Law, sec. 484.

The court instructed the jury on murder in the second degree:

"Malice is also a necessary ingredient of the offense of murder in the second degree. The distinguishing feature, however, so far as the element of malice is concerned, is that, in murder in the first degree, malice must be proved, to the satisfaction of the jury, beyond a reasonable doubt, as an existing fact, while in murder in the second degree malice will be implied from the facts of an unlawful killing.

"Implied malice is that which the law infers from or imputes to certain acts, however suddenly done. Thus, when the fact of an unlawful killing is established, and the facts do not establish express malice beyond a reasonable doubt, nor tend to mitigate, excuse or justify the act, then the law implies malice, and the murder is in the second degree; and the law does not further define murder in the second degree, than if the killing is shown to be unlawful, and there is nothing in evidence on the one hand showing express malice, and on the other hand there is nothing in evidence that will reduce the killing below the grade of murder, then the law implies malice, and the homicide is murder in the second degree.

"Now, if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant in the County of Harrison and State of Texas, on or about the 18th day of February, 1913, as alleged with his implied malice, did shoot Dan Boyd with a gun and thereby kill the said Dan Boyd, as charged in the indictment, you will find him guilty

of murder in the second degree, and assess his punishment. at confinement in the State penitentiary for any period that the jury may determine and state in their verdict, provided it be not less than five years."

Appellant complains of the concluding paragraph of this charge, and insists that in that paragraph he should have instructed the jury in regard to manslaughter and self-defense; that it eliminates from the consideration of the jury the charges on manslaughter and self-defense. A charge must be read as a whole, and thus considered. Following these paragraphs of the charge, the court instructed the jury if they had a reasonable doubt as to whether appellant was guilty of murder in the second degree, they would acquit him of murder in the second degree, and consider the charge on manslaughter, and following the charge on manslaughter he instructed the jury if they had a reasonable doubt as to whether or not he was guilty of manslaughter, they would acquit; and in addition to this gave the usual charge on presumption of innocence and reasonable doubt as to the whole case. None of the authorities cited by appellant support his contention, but all the decisions of our court have upheld charges on murder in the second degree, drawn in the language used. McGrath v. State, 35 Texas Crim. Rep., 413; Douglass v. State, 8 Texas Crim. App., 520; Hernandez v. State, 53 Texas Crim. Rep., 468; Branch's Crim. Law, sec. 426, and authorities there cited. In the case of McDowell v. State, 151 S. W. Rep., 1049, the charge did not require the killing to be upon implied malice; in this case the charge does do so, and is not subject to that criticism. The same may be said of the cases of Anderson v. State, 65 Texas Crim. Rep., 365, 144 S. W. Rep., 281, and Best v. State, 58 Texas Crim. Rep., 327, 125 S. W. Rep., 909, all of which are cited by appellant and are all that are relied upon by him, and by reference to the charge in those cases, and the charge in this case, the distinction will be plainly seen. In those cases the court only instructed the jury if the killing was "unlawful." In this case the court requires the jury to find that the killing was done with "implied malice," which term he had fully defined in the preceding paragraph.

The court in his charge submitted the issue of manslaughter. While under the facts in this case we do not think that issue was raised, the submission of it to the jury was favorable to defendant, and the court in defining adequate cause, defined it thus: By the expression of "adequate cause" is meant such as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection. And in determining whether adequate cause existed, instructed them to take into consideration all the facts and circumstances in evidence in the case, and if by reason of such facts and circumstances the defendant's mind was incapable of cool reflection, then the proof of the sufficiency of the provocation satisfies the requirements of the law. There was no statutory adequate cause testified to in the case, and as stated hereinbefore, we do not think there were facts in evidence which called for a charge

on manslaughter, but if so, the court's charge on manslaughter as a whole was as direct an application to the testimony as was required in the absence of any request for a more specific charge. In the case of Rogers v. State, 67 Texas Crim. Rep., 467, 149 S. W. Rep., 127, cited by appellant, the adequate cause testified to was a statutory cause, and in such it has always been held that the court must instruct that such provocation is in law adequate cause, but in a case where there is no statutory cause, it is right and proper to leave it to the jury to determine whether or not adequate cause existed in a case.

The only ground in the motion referred to in appellant's brief, and the only one we deem it necessary to discuss, relates to the court's charge on self-defense, appellant contending that he was entitled to a charge on self-defense on account of apparent danger, and one in connection with threats. This is the law when the evidence raises such issues, but in this case the appellant's testimony raises no issue of actual or apparent danger other than danger incident to or growing out of threats. He testified: "Monday morning I went to work cutting post, and worked all that day until Monday evening about 3 o'clock. I got some bark in my eye and quit and went home. I stayed at home about an hour and then went over to Eli Collier's to get my cousin to wash for me. My cousin is Minnie Collier, Eli's wife. I got to Eli's house about 4 o'clock and stayed there until about sundown. I took my gun with me. Eli wasn't there. I went from there on down to Dan's house. I stayed at Eli's house until about sundown and then went over to Dan's house. It is about a quarter of a mile from Dan's house to Eli's house. The sun was just going down when I first got to Dan's house. I went there and sit down on the steps at Dan's house. My wife and her two sisters were there. I just said good evening to my wife that time and that is all that was said, and I left and went on around through the bottom, and after a while I come back and asked her for the lock for my door, and asked her if she wanted to go home. I come back the second time to get the lock, a door lock. I wanted to lock up my house over at Mr. Moore's. The sun was down when I got there that time. Those same three women were there when I got back there. I asked my wife did she want to go home and she talked like she would go, and looked like the way she talked they were keeping her over there. While I was talking there Eli and Dan come up. Eli went on home and Dan stopped. Dan kept on to the lot and turned his mule loose. He never said nothing then and I went on up to Eli's house, and as I didn't see my cousin the first time and went back to see her. When Dan come before I went up to Eli's house Dan didn't say anything to me, I was gone up to Eli's this last time about a half hour. While I was up there Eli said, 'Philip, it is a good thing you got your gun, because Dan said coming on he was going to kill you tonight or tomorrow night if he caught you talking with your wife,' and I said, 'What for, I ain't done nothing to him for him to talk that way to me,' and he said, 'You heard what I told you,' and I said, 'Well, I believe I will

ask him,' and goes on down there and set on the steps and he didn't talk like he was mad at that time. When I went back there the third time and set on the steps he asked me what did my cousin say about washing, and I said she was going to wash for me, and then he went and asked his wife was any water in the trough, and come on back and then he called me around there to where he was, around at the corner of the house. I went around there and he said, 'What are you toting that God damn gun for?' and I said, 'Nothing, I just come across the bottom,' and he said, 'If I see you talking to Laura I am going to kill you,' and said, 'Wait, and I will go and get it,' and he started to the house, and I shot him. I shot once. When he left me setting on the steps in front and went around to the back he had done put up his mule. He was standing there at the corner of the house when I shot him. He was not at the gate when I shot him. When he told me what he was going to do he was as close to the gate as that man over there, about six feet, and when he turned to go in the house I shot him. I shot him because he told me he was going into the house to get his gun to kill me for talking to my wife."

It is thus seen he says that he shot deceased because he had been told of a threat of deceased, and deceased repeated the threat and started in the house to get his gun, as he thought. The court instructed the jury:

"Evidence has been introduced in this case by the defendant of threats against his life by deceased. You are instructed that where a defendant accused of murder seeks to justify himself on the ground of threats against his own life, he is permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the offense unless it be shown that at the time of the homicide the person killed by some act then done manifested an intention to execute the threats so made.

"Now, if you believe from the evidence in this case, that the deceased, Dan Boyd, had previously made threats to take the life of this defendant and that said threats had been communicated to defendant, and you further believe that at the time of the killing the deceased, Dan Boyd, started to get his gun or did some other act which reasonably appeared to the defendant to manifest his intention then and there to execute the threats previously made, viewing the same from the defendant's standpoint, or if the evidence raises in your minds a reasonable doubt as to whether deceased did so or not, then and in that event you should acquit the defendant and say by your verdict not guilty."

This was a direct application of the law to the issue of self-defense as made by the testimony of defendant, and there was no other testimony raising or suggesting the issue. The State's case would make a case of murder,—even support a verdict for murder in the first degree, because it would suggest and tend to show lying in wait, shooting deceased from the shadow of a house when deceased did not know appellant was present.

Again appellant insists that the court erred in instructing the jury,

"that if they believed from the evidence that threats had been made," that his right to act should not have thus been limited, and whether the threats had in fact been made or not, he would have the same right to act as if threats had been made, if he had so been informed. This is the law, and if the State had offered any testimony that the threats had not in fact been made, the charge would be erroneous. But the State offered no testimony as to threats, either that they had or had not been made, and the appellant elicited all testimony adduced on this issue on the trial. Appellant testified as above stated, and the only other witness testifying on this issue was Eli Collier. All the State proved by this witness was: "I know Philip Brookins and I knew Dan Boyd. I remember the time Dan Boyd was shot. Just a short time before the shooting Philip Brookins came to my house and I talked with him. It was about a quarter of an hour before the shooting. He said while at my house he was going back down there and talk to them people, and if they didn't talk to suit him he was going to burn powder. He had a Winchester with him. He come up by the side of the house and acted like he was slipping up. Didn't say anything as he come up and when I first seen him he was peeping in the hall. This was about 7 o'clock that evening. When he said what I have just told, I told him he had better take the gun and go back over to Mr. Moore's and shut up, and he said he wasn't going to be run over or bullied, and he taken the gun and went on down towards Dan Boyd's house. This all happened the evening of the shooting." This is all the evidence the State sought from this witness. When defendant was examining this witness he sought to prove that Eli had communicated the threats to appellant, thus making him his witness on that issue, the State having asked him nothing in regard to threats. The fact that the witness failed on examination by the defendant to support the testimony of appellant on that issue, and testified at the instance of appellant and in answer to questions propounded by him, "I did not tell him (appellant) at any time that Dan Boyd (deceased) said he was going to kill him," would not call for a charge such as suggested by appellant in his brief. As before stated, if the State had offered any testimony that no threats in fact had been made, or questioned the witness Collier in regard thereto, then the rule of law relied on by appellant would apply. But when a defendant testifies as to threats being made and consummated, and seeks to support that theory by testimony of another witness, and fails, and the State offers no testimony on that issue, the charge as given is a sufficient presentation of the law. The charge as given was a forceful application of the law to the plea of self-defense as made by the defendant's testimony, and the rule relied on by him does not apply under the evidence in this case. He testified to threats, and a belief that deceased started in the house to get a gun to execute the threats. Appellant then elicited from Eli the testimony contradicting the testimony of appellant on this issue. No other testimony on that point was offered by the State or defendant. There was a direct conflict in the testimony of

these two witnesses, the testimony of both on that issue being offered and introduced by appellant, when the court submitted to the jury the issue of whether or not they had been made, and under the evidence this was proper.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied June 27, 1913.—Reporter.]