### Claude Cook v. The State.

#### No. 3294. *Decided November 25, 1914.*

**1.—Murder—Sufficiency of the Evidence—Manslaughter.**

Where, upon trial of murder, the evidence did not raise the issue of manslaughter and was sufficient to sustain the conviction, under a proper charge of the court, there was no reversible error.

**2.—Same—Exculpatory Statements—Charge of Court.**

Where, upon trial of murder, appellant complained on appeal that the court should have submitted a charge on manslaughter, especially, in view of the exculpatory confessions of the defendant in evidence, but the record on appeal showed that the court properly submitted the question of exculpatory statements, and the jury found them untrue, which was borne out by the record to have been a correct finding, and the court's charge on self-defense, as raised by defendant's admissions, was applicable to the facts, and that the killing showed a homicide on implied malice, which the court submitted in a proper charge, a conviction of murder in the second degree is sustained.

**3.—Same—Circumstantial Evidence—Charge of Court.**

Where the court's charge on self-defense, insanity and exculpatory statements by defendant were all submitted in the court's main charge, there was no error in refusing special instructions thereon, and the evidence being direct by defendant's admission that he killed deceased, there was no error in the court's failure to charge on circumstantial evidence, as it is only in cases where the evidence is wholly circumstantial that the court is required to charge on circumstantial evidence.

Appeal from the District Court of Cooke. Tried below before the Hon. C. F. Spencer.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*J. T. Adams* and *Owsley & Owsley,* for appellant.—On question of court's charge on murder in the second degree: Pollard v. State, 73 S. W. Rep., 953; Beckham v. State, 69 S. W. Rep., 534; Thomas v. State, 74 S. W. Rep., 36; Neyland v. State, 13 Texas Crim. App., 536.

*C. E. Lane,* Assistant Attorney General, for the State.

HARPER, Judge.—Appellant was convicted of murder in the second

degree and his punishment assessed at twenty-five years confinement in the State penitentiary.

This is the second appeal in this case, the opinion on the former appeal being found reported in 71 Texas Crim. Rep., 532, 160 S. W. Rep., 465. We then held that the evidence did not present the issue of manslaughter, and although appellant earnestly insists that the issue is raised by the testimony, after a careful perusal of the record we see no reason to change our opinion. The deceased was named D. B. Hope. Appellant, some five years before the tragedy, had married a daughter of deceased. Two years before appellant killed Mr. Hope the wife of appellant had left him and returned to her father's home and deceased had been supporting and caring for his daughter and child. B. F. Black testified that at the time appellant and his wife separated, appellant was at work for him at his hotel, and he "just seemed like he didn't know what he was to do or was doing; he didn't seem to be at himself; all the time he wasn't busy he would talk about his wife and child to me; it hurt him a mighty lot that he couldn't stay with her; he would talk about his child mostly." This was some year and a half or more before appellant killed deceased, Black testifying that after appellant quit clerking for him in his hotel appellant worked at Goodwin's, Childs' and other places. The witness Black does say that shortly before the killing, while appellant was working for Childs, he was out hunting and slept with appellant one night, and that appellant that night talked about his wife and child, and said he had been over there to see them and Mrs. Hope had closed the door in his face, and appellant made the remark, "I am going to see my son or clean up that hill over there,"—meaning the Hope home. Witness says he told him he had better not. It is further made to appear that appellant's wife, some days before the killing, had gone on a visit to a sister in Oklahoma, and carried the child with her. That deceased, her father, carried her to the train.

W. B. McClurkan, a merchant of Denton, testified that between the time Mrs. Cook left for Oklahoma and the date of the tragedy he saw appellant and deceased talking in the town of Denton, and heard appellant speak of his wife and child. That appellant seemed excited and mad, and that deceased, Mr. Hope, was trying to pacify him.

W. G. Childs, with whom appellant was staying at the time of the tragedy, testified that appellant told him that Mr. Hope had sent his wife and child to Oklahoma; that he was considerably worried about it but he, witness, would not talk to him about it. That he asked appellant, "What could you do, you can't make them bring them back"; appellant replying he "could clean up the whole damn hill—he could do that." This occurred some four or five days before the killing. Witness further testified that on the day of the killing, appellant received a letter from a brother-in-law in Oklahoma; that he, witness, read the letter at the request of appellant. Appellant was mad and after witness read it tore the letter up. This letter from the brother-in-law told appellant where his wife was, and said, "Claude, it seems

you blame daddy Hope for Lou (appellant's wife) and Don being up here; that Hope, deceased, was not to blame, and that the writer of the letter (appellant's brother-in-law) was solely to blame." This witness further testified that after appellant had read this letter, and ate his dinner, appellant left his (witness') home carrying a Winchester rifle with him, going in the direction of deceased's home. Before a great length of time he saw appellant; that appellant had then been back to his (witness') house and changed his clothes and was going towards town, and appellant said, "Well, it is all over," and witness asked him, "What's all over?" when appellant replied, "I shot him," and upon being asked if he had killed Hope, replied, "I don't know." He was then asked what, if anything, was said at the time, and appellant replied, "I asked him where Lou and Don was and he claimed deceased replied, 'Right where I am going to keep them—and you keep off my place.'" Witness replied to this that he had heard it and he had heard. someone say that appellant had shot deceased off the binder, when appellant replied, "It's a damned lie—nobody never seen it." Appellant also said in this conversation that at the time deceased made the remark above attributed to him, he, deceased, shook the finger of his left hand at him, and dropped his right hand behind him.

In the above statement we have not related nor referred to the theory of the State as made by the testimony, but on the issue of whether or not the court erred in failing to submit the issue of manslaughter, we have taken the evidence in its most favorable light to appellant. The record discloses beyond dispute that appellant and his wife had separated some two years prior to this time; there is nothing to indicate that deceased was the cause of the separation, and the record discloses that deceased and appellant had met many times after the separation took place. But it is contended, as appellant puts it, when deceased "shipped appellant's wife and child out of the country, this was a new provocation." The testimony of Mr. McClurkan, brought out by defendant, shows that from the time deceased's wife left to go to Oklahoma and the killing, that appellant and deceased met in the town of Denton, and had a conversation about the wife and child going away; that appellant was apparently excited about it, and deceased was explaining and trying to pacify appellant. So it was certainly not the first meeting after his wife and child had been "shipped out of the country," as contended by appellant, but which the whole record discloses is not the correct way to put it, for it shows that she had merely gone on a visit to a sister, a trip for which Mr. Hope, deceased, was in no way responsible, he having merely carried her to the train in broad daylight, a fact of which appellant was fully aware, as shown by the testimony of Mr. Childs and others and is in no way disputed in the record.

But it may be contended, even if he did know about his wife going to Oklahoma, and had met Mr. Hope in Denton and talked to him about it, this would not deprive him of his right to arm himself with a Winchester rifle, and go to Mr. Hope and inquire about where his wife and child had gone. Granted, if this had been his mission, and he did

not know where they had gone to; but the testimony of Mr. Childs shows that appellant had received a letter from his brother-in-law explaining to him that his wife was on a visit to her sister, and that (as he understood appellant blamed Mr. Hope with their taking the trip) daddy Hope, deceased, had nothing to do with them taking the trip—that he, appellant's brother-in-law, was responsible for it. Not only this, but the testimony of Mr. Childs and Mr. Black shows that appellant knew where his wife and child were and had known this fact for several days, and this testimony is in no way denied or disputed in the record.

Again, under the rule of law stated in the Pharr case, 7 Texas Crim. App., 472, and other cases referred to in the opinion on the former appeal in this case, 71 Texas Crim. Rep., 532, 160 S. W. Rep., 465, the court instructed the jury: "When the confessions of a party charged with crime are introduced in evidence by the State, then the whole of the admissions or confessions are to be taken together, and the State is bound by them, unless they are shown by the evidence to be untrue, such admissions or confessions to be taken into consideration by the jury as evidence in connection with all other facts and circumstances of the case. So, in this connection you are told that if the State has not disproved the statement made by defendant to the witness Childs, etc., you will find the defendant not guilty." Thus it is seen the jury were required to find the statement made by appellant to Childs, that "he asked deceased where Lou and Don was" and deceased replied, "Where I am going to keep them, and you keep off this place," shaking his left hand at him, and putting his right hand behind him, was false and untrue before they would be authorized to convict appellant of any offense. And in addition to this gave a fair and full charge on self-defense as made by the testimony.

But did the evidence authorize the jury to find that this statement of appellant was false? In brief, the State's case is, that appellant was angry with the entire Hope family because his wife had quit him. Mr. Hope was in his field, cutting his wheat. Appellant received this letter from his brother-in-law telling him that Mr. Hope had nothing to do with Lou and Don going to Oklahoma on a visit, but in the letter appellant's brother-in-law used language towards appellant that Mr. Childs says made him angry. He takes his Winchester, leaves Childs' place, going in the direction of the Hope farm; he is seen by others going in this direction. At one corner of the wheat field the weeds were high, and in these weeds is a place where the weeds are mashed down as if someone had been hiding there; as the binder goes to make this turn (just thirty steps from this place of concealment) Mr. Hope is shot, the ball entering the right side, ranging up, going through him, the ball apparently passing through his heart. When found he had fallen to one side of the binder seat, his feet being under the seat. Appellant is seen coming from this direction, and when he meets Mr. Childs, about a quarter of a mile from the place where the killing occurred, Mr. Childs says he did not appear to be the least excited;

that he appeared cool and calm. Thus making it appear that appellant, becoming angry at what his brother-in-law had said to him in the letter, he takes his Winchester and goes a quarter of a mile to where deceased is quietly working in his field, cutting his grain; appellant conceals himself in the weeds, and as Hope drives by he shoots him, and when he walks back is perfectly calm and collected. This not only authorized the jury to find that his explanation was untrue, but the record, as a whole, excludes the idea that the killing took place under the influence of sudden passion, aroused by anything done or said by Mr. Hope that would be cause, in law, to render the mind incapable of cool reflection. Manslaughter is a killing under a passion suddenly flaming up, and the act done before the person has time to reflect. No such state of case is even suggested by this record. Not only this but the evidence shows that several evenings before the killing appellant had been in pastures close to the Hope farm, with his Winchester, sitting down, apparently watching the Hope home as if to get a chance to kill someone.

As the issue of manslaughter was not raised by the testimony, the court's charge defining implied malice is in language frequently approved by this court in such a state of case. If manslaughter had been raised and submitted in the charge, there might be some merit in the contention.

Appellant's requested charges on self-defense, insanity and that the State must show the falsity of the statement of appellant, introduced by the State before a conviction would be authorized, were embodied in the court's charge; therefore, it was unnecessary to again give them as special instructions. The evidence did not call for a charge on circumstantial evidence, as the State introduced evidence showing that appellant admitted the killing of deceased. It is only in case where the evidence is wholly circumstantial that the court is required to charge on circumstantial evidence. As hereinbefore stated, there were no exceptions reserved to the introduction of testimony, and as there is no error in the charge of the court, the judgment should be affirmed and it is so ordered.

The judgment is affirmed.

*Affirmed.*