### J. G. Merkel v. The State.

No. 3305. Decided December 9, 1914.

**1.—Rape—Sufficiency of the Evidence.**

Where, upon trial of rape by force, the evidence sustained a conviction under a proper charge of the court, there was no reversible error, and there was no error in refusing a requested charge for a peremptory acquittal.

**2.—Same—Grand Jurors—Indictment—Challenge.**

In the absence of a challenge of either of the grand jurors at the time they were empanelled, a motion to quash the indictment because the names of the grand jury were published in a newspaper forty days before the term of the trial court was correctly overruled.

**3.—Same—Special Venire—Constitutional Law.**

The Act of the Legislature passed in 1907, known as articles 5151 and 5158, Revised Civil Statutes of 1911, with reference to special venires is constitutional. Following Smith v. State, 54 Texas Crim. Rep., 298, and other cases.

**4.—Same—Jury and Jury Law—Voire Dire Examination.**

Where the record showed that defendant was only twenty-three years old when this case was tried, there was no error in not permitting him to ask the hypothetical question whether they would have a bias in favor of or prejudice against a man thirty-five years of age to have sexual intercourse with a girl sixteen or seventeen years of age.

**5.—Same—Rule Stated—Hypothetical Questions.**

Hypothetical questions as to what the juror would or would not decide in a supposed state of evidence are not admissible.

**6.—Same—Discretion of Court—Jury and Jury Law.**

In determining as to the fitness of the juror, the question is largely one of discretion with the trial judge, and this court will not revise such action unless it is made apparent that the trial judge has abused this discretion. Following Mason v. State, 15 Texas Crim. App., 534, and other cases.

**7.—Same—Conscientious Scruples—Death Penalty.**

Where the district attorney made the fact that a juror had conscientious scruples in regard to the infliction of the death penalty, a cause for challenge, and in others, he did not do so, the defendant could not legally complain.

**8.—Same—Grand Jury Testimony—Translation—Swearing Translator.**

Upon trial of rape, there was no error in admitting a translation from the German into the English of the testimony of one of defendant's witnesses before the grand jury, on the ground that the grand juror who made the translation was not sworn in the grand jury.

**9.—Same—Requested Charge.**

Where the requested charge was substantially embraced in the court's main charge, relative to impeaching testimony, there was no error in refusing same.

**10.—Same—Newly Discovered Evidence—Bill of Exceptions.**

Where the alleged newly discovered evidence could only have been used for the purpose of impeaching the State's witness, there was no error in overruling the motion; besides, the bill of exceptions with reference thereto was filed long after the adjournment of the court. Following Graham v. State, 73 Texas Crim. Rep., 28.

Appeal from the District Court of Bexar. Tried below before the Hon. W. S. Anderson.

Appeal from a conviction of rape; penalty, seven years imprisonment in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*C. E. Lane,* Assistant Attorney General, for the State.

PRENDERGAST, Presiding Judge.—Appellant was convicted of rape by force or threats on Esther Koch, a young girl about sixteen years of age, committed on or about July 17, 1913.

Some of the facts are established without any contradiction. Esther was a young German country girl, the daughter of a German Methodist preacher. Very shortly prior to the alleged rape she had lived in San Antonio as a servant for her aunt, who ran a rooming house. She was unfamiliar with the City of San Antonio. She had never seen nor heard of appellant prior to Sunday night, July 13, 1913, just three or four days before the alleged rape.

Appellant was a German twenty-three years old at the time of this trial in January, 1914. Something like two and a half years before the alleged assault he had married, but some year and a half before

then had separated from his wife but was not divorced from her. After his separation from his wife some year and a half before the alleged rape, he met a German woman, recently from Germany, whose name was Katy Sigmund, and he soon began living in adultery with her and continuously so lived with her up to the time of the commission of this offense. He had gotten her pregnant. He had been living about San Antonio some months, but just a short time before this offense he moved in rather a sparsely settled portion of the country four miles from the City of San Antonio and lived at a house with the woman Katy, ostensibly as his wife and the people in the neighborhood were so informed and regarded her. She was soon to be confined,—perhaps some two months later. He wanted to hire some girl to go out to stay with her and help do the work until after she was confined. He applied to Esther's aunt for such a girl and made arrangements with her by which he could hire Esther. For the first time on said Sunday night he met and saw Esther at church, with his reputed wife, and they, together, took Esther out with them that night to their country place in their buggy.

Esther only stayed with them from Sunday night until late Thursday evening or early Thursday night following, when appellant and his reputed wife Katy, took her back to her aunt's. When she reached her aunt's she was crying, in much distress, and at once told her aunt and uncle and others, in effect, that appellant had raped her. The next day two physicians examined her and both testified that they examined her vagina, found the hymen ruptured, the vagina lacerated and showed to be of recent origin. One of the physicians, Dr. Shropshire, testifying, "She was lacerated, torn, evidently somebody had used her, had intercourse with her, or used their fingers, one or the other. . . . The hymen was ruptured. It looked to be of recent occurrence. It was black and blue as though it was extravasated, the blood under the skin."

Of course no statement of facts can portray the testimony of any witness the same as if the witness was seen and heard by the jury and lower court, but we will here give her testimony on direct examination substantially as given in the statement of facts:

"My name is Esther Koch. My father is Rev. J. F. Koch. I know J. G. Merkel. I first met him on Sunday night at the German Methodist Church; a lady was with him whom he called his wife. He did not introduce me to her, but I heard him call her his wife. From there I went with them to their home four miles out of San Antonio, somewhere in the neighborhood of the cement works. Nothing occurred the night we got out there. I slept in the room where both of them were. The defendant always wanted to kiss me and I told him no, sir, my father learned me better and I would have none of that. That occurred several times. The first time he tried to kiss me was on Tuesday, the second day I was there. That was in the house. His wife was with us there, it was in her presence. He would always want to take hold of me, and I would push him away. I said I would not have that.

We were all in the kitchen at one time" (this seems to have been Wednesday morning) "and he picked me up and carried me out. I fought as much as I could when he picked me up,—I wanted to stay in the kitchen with his wife. He put me on a cot" (this, we take it, was Thursday evening, or at any rate, when he had the act of sexual intercourse), "took off my clothing, and my underwear. While he was taking off my underwear I fought him as much as I could, I was crying and hollering,—as soon as he took me up I began to cry. I asked him to let me alone. He was by the side of the bed when he took my underwear off, and when he was taking my underwear off I resisted him as much as I could, I fought him. I was unwilling for him to take my underwear off. I did not agree to any of these things I have testified to. After he took my underwear off he got on the bed and got on me, and when I cried out he held my mouth shut. He told me if I didn't quit hollering he would cut my throat and after a while he would cut his. This was after we got through. I saw him have a knife in his hands. I believe the knife was shut. When he got on me he took out his privates and put his privates in me. I was refusing to let him do that. It caused me a whole lot of pain. After he had finished, he went to his wife; she had fainted. She was just by the side of the bed where I was, and I was crying. After he had finished we begged him to take me home. I begged him and she begged him. He said no, she wasn't able to go and he couldn't bring me home. I didn't know the way home, I had never been in San Antonio before I came to stay with my aunt. He told me if I told what had happened he would go to jail and my name would be no account any more. My period of sickness had come on a short time before this, and after he had finished with me I saw some blood, about a washpan full. I was sitting over the washpan so the blood could run into it. His wife afterwards begged so much that he brought me home, and when he brought me home it was in the afternoon, dark. He took hold of me twice while I was out there. He took hold of me the day before, for the first time—took hold of my hands and dragged me along on the floor and threw me on the bed. He wanted to do me, and I said, 'Let me alone.' I was crying at that time. He said he wanted to play with me. He put his hands on my underwear, and when he took my underwear off I told him no. I used the German language in talking. I only speak English since I am here, just a little at school. Mr. Merkel told me if I told anybody what had occurred he would not bring me home, and I told him I wouldn't say anything. After we started home he wanted to turn back if I wouldn't promise not to tell. When I got home I told my auntie and my uncle, and all of them. I told them as soon as I got home."

Taking her testimony as a whole, she shows that he had intercourse with her only once; that he first tried to do so on Wednesday morning, she stating on cross-examination: "On Wednesday morning Mr. Merkel came into the kitchen and dragged me out by one hand, and laid me down on the bed, unbuttoned my drawers and took them off, and did

something to me, but he did not put his private organ in my private organ that morning." Appellant admitted that he had intercourse with her on Thursday morning and was about to have intercourse with her again that evening, but his reputed wife was present and raised so much trouble, and fainted, that he desisted.

The appellant, by his testimony and that of said woman with whom he lived in adultery, would show that this sixteen-year-old, inexperienced country girl beguiled him and that she induced him to have sexual intercourse with her ·in the presence of said woman and under the revolting circumstances shown. In other words, that she induced him to copulate with her and that it was not only willingly done on her part, but at her solicitation. The jury did not believe this, although the issue was submitted in his favor by the court in the strongest possible way for him.

In our opinion the evidence was sufficient to justify the conviction and we can not disturb the verdict of the jury. The court, in his charge on this issue, ·submitted everything that the law would authorize in appellant's favor. No objection is made to the charge on this question. Appellant did request a charge for peremptory acquittal but this was properly refused.

Appellant made a motion to quash the indictment, because the grand jurors' names were known publicly and published in the newspapers some forty days before the term of court. No challenge of them or either of them was made at the time they were empanelled. The statute (C. C. P., art. 409) is: "Any person, before the grand jury has been empanelled, may challenge the array of jurors or any person presented as a grand juror; and, in no other way, shall objections to the qualifications and legality of the grand jury be heard." This law shows appellant's motion could not be sustained. All the decisions are to the same effect. See some of them cited under said article of the procedure.

Appellant made a motion to quash the special venire on various grounds. He attacked the constitutionality of section 1 thereof by the Act of 1911, page 150. See Rev. Stats., arts. 5151 and 5158. The first Act on this subject was passed in 1907, page 269. The amendment of section 1 of that Act by the Act of 1911, supra, removed even some of the apparent objections that had been made to that section of the 1907 Act. This law has been held constitutional by this and the civil courts so long, and the question discussed so thoroughly, we regard it as wholly unnecessary to further discuss it. We cite some of the cases holding the law constitutional. Smith v. State, 54 Texas Crim. Rep., 298; Logan v. State, 54 Texas Crim. Rep., 74; Huddleston v. State, 54 Texas Crim. Rep., 93; Brown v. State, 54 Texas Crim. Rep., 121; Jones v. State, 54 Texas Crim. Rep., 507; Oates v. State, 56 Texas Crim. Rep., 571; Rasor v. State, 57 Texas Crim. Rep., 10; Beaver v. State, 63 Texas Crim. Rep., 581; Dallas, etc., St. R. Co. v. Chase, 118 S. W. Rep., 783; Id. v. Chambers, 55 Texas Civ. App., 331, 118 S. W. Rep., 851; Northern Texas Trac. Co. v. Danforth, 53 Texas Civ. App., 419, 116 S. W.

Rep., 148; Houston Elec. Co. v. Faroux, 125 S. W. Rep., 922; Rice v. Lewis, 54 Texas Crim. Rep., 149, 125 S. W. Rep., 961.

Appellant has two bills of exceptions on the refusal of the court to permit him to ask the special veniremen certain questions on their voir dire examination. The bills nor record otherwise shows what examination was made of the jurors on their voir dire. We do not understand from the bills or otherwise that it is claimed any juror had any bias or prejudice against appellant personally. (C. C. P., art. 692, subd. 12.) In fact the record would indicate the reverse of this. The questions asked were based on the hypothesis of whether they would have bias or prejudice against a thirty-five-year-old man having sexual intercourse with a sixteen or seventeen-year-old girl. As we understand the questions, they were not for the purpose of showing, as stated, any bias or prejudice against appellant, nor that they could not try him in this case impartially, but were directed towards their bias, etc., against the crime with which he was charged and to a hypothetical state of fact which was not shown to exist in this case. As stated above, the record shows that appellant was only twenty-three years old when this case was tried,—not thirty-five as stated in the hypothetical question. As the matter appears, we think it does not present error. The law is, as stated in 1 Thomp. on Trials (2d ed.), p. 117:

"Hypothetical questions, that is, questions as to what the juror would or would not decide in a supposed state of evidence, are not allowed," citing several authorities.

As said by this court in Mason v. State, 15 Texas Crim. App., 534: "It was the duty of the court to see that a jury was empanelled, composed of men who were free from all bias for or prejudice against the defendant; who were impartial towards either the State or the defendant. In determining as to the fitness of a juror, the question is largely one of discretion with the trial judge. He has the proposed juror before him; observes his manner of answering questions, his appearance and many other indications which can not be brought before this court; and hence the trial judge is in a much better condition to pass upon the fitness of the individual to serve as a juror in the case, than this court can be from the record alone. Such being the case, this court will not revise such action of the trial judge unless it should be made apparent to us that the trial judge had abused the discretion confided to him, to the injury of the defendant's rights, or that he had infringed the law. (Ray v. State, 4 Texas Crim. App., 450; Gardenhire v. State, 6 Texas Crim. App., 147; Wade v. State, 12 Texas Crim. App., 358.)"

Again, as said by this court in Pierson v. State, 18 Texas Crim. App., 524: "It has been well said: 'The rule is well settled that it is the duty of the court to superintend the selection of the jury, in order that it may be composed of fit persons. Large discretion must be confided to the trial court in the performance of this duty, nor will the action of the court in this behalf be made the subject of revision, unless some violation of the law is involved or the exercise of a gross or injurious discretion is shown.' (Thompson & Merriam on Juries, sec. 258.) And

it has been repeatedly held by this court that in determining as to the fitness of a juror, the question is one largely of discretion with the trial judge, and his action therein will not be revised by this court, unless it be made apparent that the discretion has been abused to the injury of the defendant's rights, or that the law has been infringed." See also James v. State, 74 Texas Crim. Rep., 139, 167 S. W. Rep., 727; Cooper v. State, 72 Texas Crim. Rep., 266, 162 S. W. Rep., 364; Ellis v. State, 69 Texas Crim. Rep., 468, 154 S. W. Rep., 1010. .

The district attorney in testing the jurors on their voir dire examination asked, under the statute, if they had conscientious scruples in regard to the infliction of the death penalty. In some instances the district attorney made this a cause for challenge and in others he did not. The appellant objected to this. This was a matter wholly within the discretion of the district attorney and the appellant could not legally complain of his action.

The appellant had said woman he was living in adultery with, Katy Sigmund, testify in his behalf. It seems she spoke German only or English very imperfectly. She testified before the grand jury. The State put on some of the grand jurors to show that her testimony before the grand jury was different in some particulars from what it was on this trial. One of these jurors testified that he translated for the other jurors some of her testimony. Appellant objected to this grand juror's testimony on this point because the grand juror was not sworn in the grand jury as a witness to make such translations. This shows no error.

The appellant requested a special charge relative to the evidence impeaching said woman. The court, as we take it, copied almost literally, at least substantially, this charge in his main charge to the jury and refused appellant's. The court's charge covering that requested by appellant, it was proper to refuse his.

Appellant has one bill complaining that the court erred in overruling the amended motion for new trial wherein he set up newly discovered testimony. No such motion is in the record. From the bill on the subject, however, it is shown that said claimed newly discovered testimony could have been used solely for the purpose of impeaching the State's witness, or, as stated in the bill, "it raises a doubt as to the truthfulness of Esther Koch." The record also discloses that the court heard evidence, affidavits, on this subject, but what they were the record does not disclose. The bill was filed long after the adjournment of the court and the evidence could not be considered on that ground even if it had been contained in the bill. (Graham v. State, 73 Texas Crim. Rep., 28, 163 S. W. Rep., 726, and cases collated.) Besides, it is the uniform holding of this court that new trials will not be granted for newly discovered evidence, even if newly discovered, which goes merely to the impeachment of a witness.

The judgment is affirmed.

*Affirmed.*

DAVIDSON, JUDGE, dissents.