### George McKinney v. The State.

#### No. 4133.    Decided June 21, 1916.

**1.—Murder—Sufficiency of the Evidence.**

Where, upon trial of murder, defendant claimed accidental shooting and this question was specifically submitted to the jury, who found him guilty, assessing the death penalty, and the evidence, under a proper charge of the court, was sufficient to sustain the conviction, there was no reversible error

**2.—Same—Jury and Jury Law—Vo.r Dire Examination.**

Where, upon trial of murder, the court refused to permit the defendant to ask each juryman on voir dire, if after hearing the evidence, he would have a reasonable doubt of the intent of the defendant to kill deceased, he would give the defendant the benefit of the doubt, but it appeared from the record that each juror was asked, if he had a reasonable doubt of the guilt of the defendant, would he acquit him, there was no reversible error. Following Ellis v. State, 69 Texas Crim. Rep., 468, and other cases.

**3.—Same—Evidence—Dying Declarations.**

Where, upon trial of murder, a proper predicate was laid for the admission in evidence of the dying declaration of the deceased, to wit, "George shot me because I wouldn't go with him. He ought to be hung, oughn't he," and it appeared from the record that no objection was made to strike out the latter words, there was no reversible error.

**4.—Same—Dying Declarations—Rule Stated.**

While all the requisites prescribed by law must be shown, in order that the dying declaration may be admissible, yet it is not necessary that all these requisites shall be established by direct and positive testimony of the deceased at the time. Following Hunnicutt v. State, 18 Texas Crim. App., 498, and other cases.

**5.—Same—Dying Declarations—Rule Stated.**

If the dying declarations were made under a consciousness of impending death, without hope of recovery, the length of time deceased lived after making them is immaterial. Following Fulcher v. State, 28 Texas Crim. App., 465, and other cases.

**6.—Same—Rule Stated—Evidence.**

The erroneous admission of testimony is not cause for reversal, if the same fact is proven by other testimony not objected to. Following Wagner v. State, 53 Texas Crim. Rep., 306, and other cases.

**7.—Same—Evidence—Rule  Stated—Objectionable  Testimony  Must  Be Pointed Out.**

Where an objection is made to the whole of certain testimony, a part of which is admissible and a part of which is inadmissible, there is no reversible error, unless specific objection be made to that part which is inadmissible. Following Ortiz v. State, 68 Texas Crim. Rep., 524, and other cases.

**8.—Same—Evidence—Cross-examination—Bill of Exceptions.**

Where, upon trial of murder, the defendant objected in not being permitted to cross-examine a State's witness to show that he was unfriendly to the defendant, but it appeared from the record that the very fact he wanted to prove had been established without controversy, there was no reversible error; besides the bill of exceptions was defective.

**9.—Same—Evidence—Bloody  Clothng—Remarks  by  Witness—Side-bar Remarks.**

Where, upon trial of murder, the State was permitted to introduce in evidence the blood-stained garments of the deceased, to show the location of the wounds of the deceased about which there was controvery, there was no reversible error. Nor did the court err in not granting a new trial on account of side-bar remarks of one of the State's witnesses, the record showing that they were not heard by the court or jury, nor was exception reserved thereto at a proper time.

**10.—Same—Evidence—Bill of Exceptions—Cross-examination.**

Where, upon trial of murder, it appeared from the record of the case that defendant had succeeded in getting from the witness on cross-examination in substance and effect all that he could get, and there was no showing in the record what else he could have gotten from the witness, there was no reversible error; besides the bill of exceptions was defective.

**11.—Same—Evidence—Arrest—Declarations of Defendant**

Upon trial of murder, there was no error in admitting in evidence the declarations of the defendant asking whether the deceased was dead; defendant not being under arrest at the time.

Appeal from the District Court of Bexar. Tried below before the Hon. W. S. Anderson.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Chas. C. Todd,* for appellant.—On question of dying declaration: Lister v. State, 1 Texas Crim. App., 739; Wilson v. State, 49 Texas Crim. Rep., 50.

On question of cross-examination on animus of witness: Miller v. State, 28 Texas Crim. App., 445; Marsh v. State, 54 Texas Crim. Rep., 144; Green v. State, 53 id., 490.

*C. C. McDonald,* Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of the murder of a negro woman, Alice Parrish, and the death penalty assessed.

His defense was accidental shooting. This question was specifically submitted to the jury for a finding in the very language of appellant in his special charge which was given. The jury found against him on it. They could not have done otherwise under the testimony.

No complaint is made of the charge of the court. He has several bills of exceptions. We will discuss each.

He complains that the court refused to permit him, on the objection of the State, to ask this question of each venireman: "If, after hearing the evidence in this case, you have a reasonable doubt of the intent of the defendant to kill deceased, would you give the defendant the benefit of that doubt?" The court made this explanation in allowing the bill:

"The objection stated was directed to the question as asked in the form asked, and the defendant was never denied the right to ask each and every venireman, and, in fact, did ask each venireman, the question:

"'If, after hearing the evidence in this case, you have a reasonable doubt of the guilt of the accused, will you give him the benefit of that doubt and acquit him?'

"It was the judgment and opinion of the court that the question as asked fully protected the rights of the defendant, while the question desired to be asked was directed to one single element of the offense of murder, and, if it had been allowed, other questions covering each and every other element of the case, both for the State and defense, must likewise have been allowed. If this had been done, the trial would have been unreasonably extended, and, further, the defendant never exhausted all his peremptory challenges."

The court's action in refusing to permit appellant to ask said question was correct. Ellis v. State, 69 Texas Crim. Rep., 468; Merkel v. State, 75 Texas Crim. Rep., 551, 171 S. W. Rep., 738, and authorities therein cited.

In his next bill he shows that the district attorney asked his witness Edna Bowman if she heard deceased make any statement on the night she was shot. She answered she did, and stated that no one was present at the time but herself. That she, the witness, was the only one in the room with the deceased at the time. He then asked: "What, if anything, did she say in regard to who it was (referring to who shot her)?" Quoting from the bill: "To which question the defendant then and there objected, which objection was by the court overruled, and the defendant excepted because it does not appear that the precedent required by statute that the deceased was conscious of approaching death, had no hope of recovery and was fully conscious of what she was saying and doing at the time said statement was made; said testimony being material because the deceased answered said question that 'George shot me because I wouldn't go with him. He ought

to be hung, oughtn't he?'" The bill then states that the defendant
further excepts because the answer called for a conclusion of the de-
ceased and did not state the conversation that occurred between the
defendant and the deceased which led to the conclusion testified to
that George shot her because she would not go with him. The court
before approving this bill explains and qualifies it as follows:

"Before the witness Edna Bowman was asked the question and gave
the answers complained of, it had been established by other witnesses
that at the time, or within a few minutes of the speaking of the words
recited by the witness Edna Bowman that the deceased was sane, fully
conscious and knew that she was going to die and had no hope of
recovery, as will be seen from the testimony of Fannie Thompson,
Dr. H. H. Ogilvie and Curtis Parrish; also all three of those witnesses
testified to dying declarations of substantially the same words as
testified to by the witness Edna Bowman, without objection on the
part of the defendant. The testimony of the witnesses Fannie Thomp-
son and Dr. H. H. Ogilvie shows the proper predicate to the intro-
duction of dying declarations, and no change in the condition of the
deceased from the time at which they saw her until she spoke to Edna
Bowman was shown or suggested.

"The objection was to the question and not to the answer of any
portion thereof, and no objection was made, and no motion was made
to strike out the answer nor the words: 'He ought to be hung,
oughtn's he?'"

The statute (C. C. P., art. 808) expressly prescribes what the proof
shall show before a dying declaration of a deceased is admissible. This
statute has been in force for many years and has frequently been dis-
cussed, construed and applied in many cases. The rules applying
thereto are well established by the decisions both of this court and our
Supreme Court when it had criminal jurisdiction, and while all the
requisites prescribed by the statute must be shown in order that the
dying declaration be admissible, it is held, that it is not necessary that
all these requisites shall be established by direct and positive testimony
of the deceased at the time. It is enough if it satisfactorily appear
that the proper proof was made; whether it be directly proved by the
express language of the declarant or others, or be inferred from his
evident danger, or the opinions of the medical or other attendants
stated to him, or from his conduct or other circumstances of the case,
all of which are resorted to in order to ascertain the state of the
declarant's mind and the facts to make the dying declaration admis-
sible. Hunnicutt v. State, 18 Texas Crim. App., 494; Cook v. State,
22 Texas Crim. App., 511; 3 S. W. Rep., 749; Miller v. State, 27 Texas
Crim. App., 63, 10 S. W. Rep., 445; King v. State, 34 Texas Crim.
Rep., 228, 29 S. W. Rep., 1086; Connell v. State, 46 Texas Crim.
Rep., 259, 81 S. W. Rep., 746; Thomas v. State, 49 Texas Crim. Rep.,
633, 95 S. W. Rep., 1069; Sims v. State, 36 Texas Crim. Rep., 154,
36 S. W. Rep., 256; Douglass v. State, 58 Texas Crim. Rep., 122,

124 S. W. Rep., 933; Johnson v. State, 66 Texas Crim. Rep., 686, 149 S. W. Rep., 165; Christian v. State, 71 Texas Crim. Rep., 566, 161 S. W. Rep., 101; Sorell v. State, 74 Texas Crim. Rep., 505, 169 S. W. Rep., 299; Marshall v. State, 78 Texas Crim. Rep., 451, 182 S. W. Rep., 1106.

It is also established that if the dying declarations were made under a consciousness of impending death without hope of recovery, the length of time deceased lived after making them is immaterial. Fulcher v. State, 28 Texas Crim. App., 465; Crockett v. State, 45 Texas Crim. Rep., 276; Hunter v. State, 54 Texas Crim. Rep., 224; Brookins v. State, 71 Texas Crim. Rep., 101, 158 S. W. Rep., 521; Francis v. State, 75 Texas Crim. Rep., 352, 170 S. W. Rep., 779. On these propositions see 2 Branch's Ann. P. C., p. 1035; 2 Vernon's Cr. Stat., p. 746.

Another principle of law is applicable, and that is: "The erroneous admission of testimony is not cause for reversal if the same fact is proven by other testimony not objected to." Wagner v. State, 53 Texas Crim. Rep., 306, and cases cited therein; Bailey v. State, 69 Texas Crim. Rep., 474; Christie v. State, 69 Texas Crim. Rep., 602; Tinker v. State, 77 Texas Crim. Rep., 506, 179 S. W. Rep., 572, and many other cases.

And there is still another well established principle applicable, and that is: where an objection is made to the whole of certain testimony, a part of which is admissible and a part of which is inadmissible, such objection and the admission of such testimony presents no reversible error. In order to present error, specific objections must be made to that part which is inadmissible and not to the whole, a part of which is admissible. Ortiz v. State, 68 Texas Crim. Rep., 524; Payton v. State, 35 Texas Crim. Rep., 508; Gaines v. State, 37 S. W. Rep., 331; Tubb v. State, 55 Texas Crim. Rep., 606; Cabral v. State, 57 Texas Crim. Rep., 304; Hughes v. State, 152 S. W. Rep., 914; Pinkerton v. State, 71 Texas Crim. Rep., 195; Boyd v. State, 72 Texas Crim. Rep., 521, 163 S. W. Rep., 67; Lopez v. State, 73 Texas Crim. Rep., 624, 166 S. W. Rep., 154; Francis v. State, 75 Texas Crim. Rep., 362, 170 S. W. Rep., 782; Zweig v. State, 74 Texas Crim. Rep., 306, 171 S. W. Rep., 747; Ghent v. State, 76 Texas Crim. Rep., 523, 176 S. W. Rep., 566; Aven v. State, 77 Texas Crim. Rep., 37, 177 S. W. Rep., 82. If appellant had objected at the time to that part of the deceased's statement: "He ought to be hung, oughtn't he?" or if he had later made a motion to exclude it and the court had overruled such objections or such motion, then reversible error might have been presented; but as shown, he made no objection to that part of the answer only, and made no motion to exclude it at all. So that, under no contingency, does his bill present any reversible error.

By his bill No. 3 it is shown that he was cross-examining Hugh Lindsey, a State's witness, and asked him: "Q. 'You have known George (McKinney) three years?' A. 'Yes, sir; I have heard tell of him before.' Q. 'Are you friendly with George?' A. 'Yes, sir; I

am acquainted with him.' Q. 'Did you know at the time that the Parrishes were—' " At this point the district attorney interrupted the question and objected that the witness could have heard it from hearsay only, and it would throw no light on the transaction, would have no bearing on the question,—it would not serve to show any motive, his knowledge or lack of knowledge. The court sustained the objection. The bill shows that appellant then excepted in that he was not permitted to finish his question, which he states would have been: "Did you know at the time that the Parrishes were unfriendly towards the defendant and objected to Alice Parrish going with the defendant?" He claims in his bill that all the Parrishes had testified against him, and it was important for him to show their animosity against him, and he was deprived of the right not only of asking the question but having the answer "to show that the Parrishes were unfriendly with the defendant." The court explained and qualified this bill as follows: "The question sought to be asked by the defendant, through his attorney, called for hearsay, and the conclusion of the witness, and was inadmissible for the further reason that, if admitted, the answer would have been material for one purpose only, that is, it would have been material to show the animus, interest or bias of the Parrish family. The animus, interest and bias had already been freely admitted by each member of the Parrish family who testified, and the identical information sought to be elicited by this question had already been admitted by each one of them, consequently, there being no denial of their animus and interest, it was not proper for the defendant to prove same from any other source." As thus qualified, the bill shows no error. What the answer of the witness would have been is not stated, except inferentially that the Parrishes were unfriendly to him. Whether his knowledge was such as that it would or would not be hearsay is not disclosed, but at any rate when the evidence, as stated by the court, established without controversy the very facts that he wanted to prove, of course no injury was done him by the action of the court.

His next two bills (4 and 5) will be stated and considered together. In the fourth he objected to the introduction of the blood-stained garments of the deceased, claiming that they were introduced for the purpose and with the intention to inflame the minds of the jury against him and that it did so. In the fifth he claims that the mother of deceased after she left the stand said in the hearing of the jury: "He murdered my daughter and ought to be hung." These grounds were also set up in appellant's motion for a new trial. The motion on both these grounds was expressly contested and denied by the sworn affidavit of the district attorney.

The court in approving these bills fully qualified and explained them. The qualification to the fifth is embraced in that to the fourth, and while it is quite lengthy, we regard it as of sufficient importance to justify the quotation of the whole of it. It is:

"The State introduced the doctor in attendance (Dr. H. H. Ogilvie)

and the undertaker (George Williams), both of whom testified to the location of the wounds. The undertaker stated that there were three wounds, grouped together in such a manner as to form a triangle, indicating the triangle by holding up three of his fingers so that the tips of his fingers formed a triangle. The physician testified that there were three holes in a straight perpendicular line up and down the throat and that each was a small bullet hole and that the spaces between them were about three-fourths of an inch. Upon cross-examination he expressed the opinion that all three of them could have been made by one bullet entering the top hole first, emerging at the second and re-entering at the bottom.

"They both testified to one exit at the back of the neck, but neither testified to the exact location of the point of exit. The declared purpose of the district attorney in offering the dress (the only bloody garment) was to meet the opinion of the witness (Dr. H. H. Ogilvie) that one bullet could have made all three wounds by showing that the bullet hole in the collar of the dress was opposite the lower hole in the throat; that it would have been a physical impossibility for a bullet encountering only fleshy tissues in the throat, ranging downwards, to have been deflected at a right angle in its downward course so as to make an exit at the point at which it penetrated the dress in the rear.

"The coat offered in evidence had no blood on it and was offered both for the purpose of showing the location of the point of exit by holes in the collar thereof, and for the purpose of identifying a button, both by its absence from the coat and its exact correspondence with other buttons on the coat, which button had been found at the place of the homicide and was offered as a circumstance indicating a struggle, which fact was denied by the defendant, who claimed accident.

"There is nothing in the record to sustain counsel's conclusion that the dress (the only bloody garment offered in evidence) or the coat (which had no blood on it) was offered for the purpose of inflaming the minds of the jury or that it did do so. The facts in reference to this matter and to the claimed outburst of the deceased's mother just after leaving the witness stand do not show in the record, but are as follows:

"At the time of the trial counsel for the State and defendant were seated at a table in the courtroom, which table was four feet two inches broad and eight feet two inches long and was placed long ways in front of the jury box and with its narrow end facing the witness box and the judge's rostrum, and its long side parallel with the jury box. The edge of the table nearest the jury box was seven feet from the nearest juror and the edge that was nearest the judge's rostrum and the witness stand was some eight feet from said witness stand and rostrum. Counsel for defendant was sitting on the far side of the table from the jury, and, therefore, some eleven feet from the nearest juror. Counsel for the State was sitting on the near side of the table toward the jury, and, therefore, not more than seven feet from

the nearest juror. The witness Mary Parrish, mother of the deceased, was placed upon the witness stand by the State to establish facts known to her alone as will appear by the record and was cautioned by the district attorney when placed upon the stand to answer questions asked only. After having testified and whilst the witness was leaving the witness stand and whilst proceeding away from the jury around the end of the table nearest the witness stand, and, therefore, with her back or left side face toward the jury at the moment when she was just around the end of the table and was by the side of defendant's counsel and not more than a foot or so from him but fully eleven or twelve feet from the State's counsel and four or five feet from the nearest juror she said something. The words she spoke were not intelligible and could not be understood either by the judge trying the case, the stenographer taking the testimony or State's counsel, as will appear as to State's counsel from an affidavit of the district attorney and his assistant controverting the defendant's amended motion for a new trial. On the hearing of the amended motion for a new trial no effort was made by the defendant to overcome this controverting affidavit and no evidence was offered from any source to show that the jury had noticed the fact that the witness had spoken at all after leaving the stand nor heard any word or words that the witness may or may not have stated at this time and nowhere is it shown that anyone save defendant's attorney, who was nearer to the witness than any other person in the courtroom, ever heard what she said. Moreover, the defendant did not at the time of the incident or at any other time object to the conduct of the witness after she had so left the witness stand, nor did he move to have the jury instructed not to consider her said conduct and remarks, if any, nor did he except to any act or omission of the court in connection therewith and the stenographer's record of the whole trial is totally silent upon this subject and does not show that any incident such as complained of by defendant ever in fact occurred, and this bill of exception is approved only because it contains a matter with reference to objection to the introduction of the clothing to which an exception was properly reserved and is thus qualified with reference to this matter outside of the record in order that the appellate court may know the facts as they actually transpired and the conditions surrounding the incident."

The authorities are abundant that the bloody dress, under the circumstances, was admissible. Burgess v. State, 78 Texas Crim. Rep., 469, 181 S. W. Rep., 465, and a large number of cases collated in 2 Branch's Ann. P. C., p. 1031. Neither of these bills as qualified by the judge shows any error.

By his bill No. 6 he shows that Curtis Parrish, Jr., after having testified at first, was later recalled by the State and testified to an occurrence to which he did not testify when first on the witness stand nor at a previous trial of the case. Appellant's attorney in cross-examination of him asked him: "Q. 'You did not testify to this

occurrence at the last trial?' A. 'No, sir.' Q. 'This gun play was not testified to by you in the last trial?'" Upon the objection of the district attorney, he was not permitted to further cross-examine him on this point. In his bill appellant claims that he had the right and strove to cross-examine him to impeach his testimony and as to why he did not testify to this same occurrence at the previous trial in spite of the fact that he had then testified that he related all the troubles between defendant and deceased, in order that the jury might determine his credibility and the weight to be given to his evidence. The court explained and qualified this bill, saying: "The objection stated was sustained to the question as asked, because it was not in proper form to lay a predicate for the impeachment sought as shown by the bill. The 'gun play' referred to did not refer to any trouble between the deceased and defendant, but to trouble between the father of the deceased and the defendant." This bill as presented is not full enough to show any error, nor is it full enough to be intelligible without stating further as shown by the record, which we will now do. Besides the bill no record otherwise shows what the witness would have testified.

The State introduced said witness in at first making out its case before the jury. His testimony then was solely to the effect that he saw his sister, the deceased, and appellant together at a ball on the night previous to the time she was shot and killed. "He was quarreling with my sister, at least I thought he was, he was in an angry manner, he was standing looking at my sister. Nothing occurred because I told him not to bother my sister," and he said he was not going to bother her at the ball or elsewhere; that he had some sense. This witness further testified that he next saw his sister that night at his home, where she was lying shot, and he asked her who shot her, and she said: "George McKinney shot me because I did not go with him." This is in substance the whole of his testimony given at that time. Of course, the jury saw and heard and knew this. The State soon after rested. Thereupon, appellant testified in his own behalf, and introduced, it seems, two other witnesses on other matters, unnecessary to state, having no connection with this matter. Thereupon, the State, after introducing other witnesses on other subjects, later introduced the mother of the deceased, who, among other things, testified in substance that one night shortly before the homicide her daughter, the deceased, out in the street near her home, called for her for protection against appellant, when she, her husband and said son went out to where she was. That she ran up to appellant and asked him what he meant by meddling and quarreling with her daughter. That he ran his hand in his pocket to pull a gun on her, the witness. Thereupon, the State introduced said Curtis Parrish, Jr., who then testified to this occurrence, to the effect that appellant said to him not to come towards him; that he would shoot and that he had a gun, and while his faher had gone and gotten a gun, his mother

would not let his father shoot deceased, but prevented it. His father testified to substantially the same thing. It was on his cross-examination of Curtis Parrish, Jr., that the trouble arose as complained of in the bill.

We think it certain from the record and bill that, without any controversy, or dispute, appellant succeeded in getting from the witness on this cross-examination in substance and effect all he could have gotten by any lengthy cross-examination. The bill or record does not show what else he could have gotten from the witness. It would have been better perhaps for the court not to have cut him off from his further claimed cross-examination. When the witness testified positively as he did, as shown by the bill, that he did not on the previous trial testify to this occurrence between his sister and appellant and his mother, father and himself, there was nothing to impeach him upon. He admitted that he had not sworn to this on the previous trial. The jury positively knew at that time that he had not done so in his testimony when first introduced by the State on this trial. This bill presents no reversible error.

Appellant's seventh bill complains that the court permitted over his objections the officer who arrested him to state that appellant when he first saw him asked the officer if she was dead. His objection was thus made after he was arrested. The court's qualification shows the reverse of this, and as qualified, the bill shows no error.

The only other bill is to the overruling of his motion for a new trial. This presents no error.

This being a death penalty case, we have given the record, appellant's brief and the clear and forcible argument of appellant's able attorney, thorough consideration and investigation. We think the evidence is amply sufficient to sustain the verdict, but see no necessity of reciting it, and that no error is shown which would authorize or justify this court to reverse this judgment. It will, therefore, be affirmed.

*Affirmed.*